JjLEON A. CANNIZZARO, JR., Judge.
The defendant, Gordon Newman, was convicted on June 17, 1998, of committing first degree murder on April 18, 1995. He was sentenced on June 17, 2003, to life imprisonment in connection with his conviction. Mr. Newman is now appealing his conviction and his sentence.
STATEMENT OF THE CASE
Mr. Newman was indicted for the first degree murder of Romero Dupre, and he pled not guilty at his arraignment. He filed a motion to quash the indictment, which was denied. Mr. Newman also filed a number of motions, including motions to obtain the grand jury testimony and the rap sheets of certain persons. The trial court granted these particular motions, but this Court vacated the trial court’s order in part, requiring only certain portions of the grand jury testimony and the rap sheet of only one of the State’s witnesses to be disclosed. State v. Newman, 96-2788 (La.App. 4 Cir. 2/19/97), unpub., writ denied, 97-0736 (La.5/1/97), 693 So.2d 740.
Mr. Newman was tried before a twelve-person jury. The jury returned a unanimous verdict of guilty as charged. The jury rendered a verdict at the 12sentencing phase of the trial finding that Mr. Newman should not receive the death penalty but should be sentenced to life imprisonment instead.
Mr. Newman was scheduled to be sentenced a month after his conviction, but he repeatedly moved for continuances of the sentencing hearing. Almost three years after he was convicted, Mr. Newman filed a motion for a new trial. Six months later a hearing on the motion was held, and approximately four months after the hearing, the trial court granted Mr. Newman’s motion for - a new trial. The State filed an application for supervisory writs to review the trial court’s decision to grant Mr. Newman a new trial, and this Court granted the writ application and reversed the trial court ruling. State v. Newman, 2002-0666 (La.App. 4 Cir. 4/10/02), unpub., writ denied, 2002-1483 (La.3/21/03), 840 So.2d 536.
Five years after Mr. Newman was convicted, he was sentenced to life imprisonment. A month after he was sentenced, the trial court denied his motion to reconsider his sentence but granted his motion for an appeal.
STATEMENT OF FACTS
On the night that Mr. Dupre was killed, Mr. Newman and Anthony Shelton went to a residence on Telemachus Street in New Orleans to purchase drugs. According to the trial testimony of Raymond Sias, Mr. Dupre had arranged to sell cocaine to Mr. Newman and had requested that Mr. Sias “front” the sale for him, meaning that Mr. Sias would make it appear to Mr. Newman and Mr. Shelton that Mr. Sias was actually the seller of the drugs.
The four men had agreed to meet at the Telemachus Street house where Vernon York, a close friend of Mr. Sias, lived. Mr. Sias had previously lived with Mr. York on Telemachus Street and still had a key to the house. Mr. Sias had arranged with Mr. York to use the house on the evening of the drug transaction.
| ?According to Mr. Sias’ testimony, on the day that Mr. Dupre was killed, Mr. Newman and Mr. Shelton met with Mr. Sias and Mr. Dupre, first at Mr. Newman’s home and then later at a daiquiri shop. They met at Mr. Newman’s home to discuss the details of the drug transaction and at the daiquiri shop to confirm that Mr. Newman and Mr. Shelton had obtained the money needed to buy the drugs. Once Mr. Dupre and Mr. Sias were satisfied that Mr. Newman and Mr. Shelton *873 had the money, all four men left the daiquiri shop. Mr. Dupre and Mr. Sias left in one vehicle, and Mr. Newman and Mr. Shelton followed them in Mr. Shelton’s jeep. The men drove around for some time to make certain that their vehicles were not being followed. When the four men finally arrived at the house on Telemachus Street, Mr. Shelton remained in his jeep with the money that was to be used to buy the drugs, and the other three men went inside the house.
Mr. Sias testified that Mr. Newman was very nervous, because he was concerned that someone might be inside the house, waiting to rob him. Therefore, Mr. Sias and Mr. Dupre invited Mr. Newman into the house so that he could verify that no one was there to rob him.
Mr. Sias testified further that Mr. Dupre and Mr. Newman went into the second room of the house where Mr. Newman was apparently shown the drugs that he was to buy. Mr. Sias stayed by the front door of the house, which he had locked with a deadbolt key.
Mr. Newman indicated that he was satisfied with the drugs he was to buy, and he asked Mr. Sias to unlock the front door so that he could ask Mr. Shelton to bring the money inside. When Mr. Newman walked outside of the house, he called to Mr. Shelton to bring the money. He then turned, pulled a gun from his waistband, and shot Mr. Sias in the head. As Mr. Sias fell on the front porch of | ¿the house, he heard Mr. Newman yell to Mr. Shelton, “Get the shotgun for this motherfucker.”
Before he lost consciousness, Mr. Sias heard a car door close, and then he heard a series of gunshots. At the trial, Mr. Sias testified that he believed that he had been shot with a nine millimeter gun. Mr. Dupre had been fatally wounded.
Richard LeBlanc, a detective assigned to the homicide unit of the New Orleans Police Department (the “NOPD”),[1] was the lead detective in this case. When Detective LeBlanc arrived at the scene of the shootings, Mr. Sias and Mr. Dupre’s body had already been moved from the scene. Detective LeBlanc observed a pool of blood, a bullet casing, keys, and some change on the front porch of the Telemachus Street house. Inside the house he saw blood and additional bullet casings in the second room of the house. Toward the rear of the house, just outside of the kitchen door, he observed more blood, a bullet fragment, two more bullet casings, and two bullet holes in the floor. The kitchen door also had bullet holes in it. In an open dresser in a bedroom, a nine millimeter handgun and nine clear, plastic bags of a green vegetable matter, which was believed to be marijuana, were found.
During his investigation Detective Le-Blanc found a nine millimeter handgun in an alley approximately one block from the Telemaehus Street house. Across the street from the alley where the gun was found, Detective LeBlanc found Rand seized a brick-shaped object from a hedge. The object appeared to be cocaine to the detective.[2]
While Detective LeBlanc was working at the crime scene, Mr. York, who lived at the Telemaehus Street house, arrived. He was interviewed by the detective, and to account for his whereabouts at the time *874 Mr. Dupre was killed, he provided a receipt for purchases that he had made at a store earlier that evening. Based on the time on the receipt and the fact that the items listed on the receipt were in Mr. York’s truck, Detective LeBlanc concluded that Mr. York had not been involved in the crime that had occurred that night.
Several days after the shootings the NOPD homicide unit received information that one of the people involved in the shootings was Mr. Newman. Detective LeBlanc obtained a photograph of Mr. Newman and prepared a photographic line-up. A few days later he met with Mr. Sias, who viewed the line-up and identified Mr. Newman as the person who shot him. Mr. Sias also made an in-court identification of Mr. Newman at the trial.
Detective LeBlanc testified that Mr. Shelton was also developed as a suspect in the shootings. A few days after Mr. Sias identified Mr. Newman, Detective LeBlanc conducted a second photographic line-up. Mr. Shelton’s picture was in that line-up, and Mr. Sias identified Mr. Shelton[3] as another person who was at the Telemachus Street residence when the shooting occurred.
| (¡Prior to the positive photographic lineup identifications by Mr. Sias, he had been shown a photographic line-up containing the photograph of Hosea Brown, who had been identified in a tip to police as the person who placed the brick of cocaine in the hedge where it was found. Mr. Sias failed to identify Mr. Brown, however.
After the shooting, Mr. Newman left New Orleans. He was arrested in Los Angeles, California seven months after the crime and was returned to New Orleans to stand trial.
At the trial Dr. Richard Tracy, an expert in forensic pathology, testified that he had conducted an autopsy on Mr. Dupre’s body. From the autopsy Dr. Tracy determined that Mr. Dupre had been shot seven times with two different types of bullets. Only one wound was fatal, and that wound was inflicted by a .38 caliber bullet. The other wounds were caused by nine millimeter bullets. Dr. Tracy could not determine in what order the bullets were shot, but he was able to determine that the entry wounds showed that Mr. Dupre had been in various positions during the shooting. Two of the bullet wounds, including the fatal chest wound, left powder marks on Mr. Dupre’s skin, indicating that a gun was discharged between two and fifteen inches from his body. Dr. Tracy testified that toxicology tests conducted in connection with the autopsy showed that there were no illegal substances in Mr. Dupre’s body but that he had a blood alcohol level of 0.01 percent.
NOPD Officer Kenneth Leary, an expert in the field of ballistics and the identification of firearms, testified at the trial regarding his examination of the evidence in this case. He determined that the nine millimeter gun that was found in the alley matched two of the nine millimeter bullets that had been recovered at the autopsy of Mr. Dupre’s body and one of the bullets that was found at the scene of |7the shooting. Of the eleven casings that Officer Leary examined, all of them matched the nine millimeter gun that had been found. Officer Leary also testified that there were three .38 caliber copper bullet jackets found on the scene or recovered at the autopsy. Two of these were definitely fired from the same gun, but the third bullet jacket was deformed such that Officer *875 Leary could not be certain that the deformed jacket was fired from the same gun that fired the other two .38 caliber bullet jackets. Therefore, he could not be absolutely certain that there were only two guns involved in the shootings.
Mr. Dupre’s cousin, Terry McCloughin, testified at the trial. He said that he saw Mr. Dupre in the morning on the day that Mr. Dupre was killed and that Mr. Dupre told him then about the drug transaction involving Mr. Newman. Mr. McCloughin further testified that Mr. Newman and Mr. Dupre were friends.
Tyrone Smith also testified at the trial. Mr. Smith testified that he lived in the neighborhood where the Telemachus Street house was located and that on the night of the shootings, he went outside when he heard what sounded to him like firecrackers. He said that he looked at the porch of the house where the shootings took place and saw two people, one of whom was falling. He testified that the second person that he saw went inside the house. Mr. Smith further said that he approached the house and heard two voices that sounded like two people yelling at each other. He determined that someone was dead in the kitchen based on the conversation that he heard. The man who had been on the porch with the man who had been shot came back outside, went into the street, and turned right toward a canal. A second person then came running from the house, and he turned toward Xavier University. Mr. Smith then saw a black jeep coming down the street.
|sMr. Smith tried to follow the jeep, but he was not able to do so. He then ran to the Xavier University security office, which was nearby, to request help. Mr. Smith said that he had not seen any of the parties well enough to be able to identify them.
After Mr. Smith testified, the defense recalled Detective LeBlanc and questioned him regarding the statements that Mr. Smith had made on the night of the shootings. Mr. Smith had told Detective Le-Blanc that he was in his garage when he heard gunshots. Mr. Smith said that he then ran outside and saw a black male running away and a black jeep driving toward Washington Avenue. Mr. Smith did not tell Detective Leblanc that he had observed the actual shooting of the man he saw on the porch, and he did not report to Detective LeBlanc that he had heard a conversation involving the perpetrators, although Mr. Smith’s testimony at the trial covered these points.
The defense also sought to discredit Mr. Sias’ testimony, and Mr. Sias did admit on cross examination that he had not told the police that he and Mr. Dupre were engaged in a drug transaction with Mr. Newman when he had first been questioned. He also admitted that he had two prior convictions for selling drugs, one in Virginia and one in Maryland. He further admitted that he would face a life sentence as a three time offender if he were convicted of a violent crime in Louisiana, but he denied that the police or district attorney’s office had offered him any consideration for his testimony in this case. Mr. Sias also admitted that he was not shocked to learn that the police had found marijuana packaged for sale at Mr. York’s Telemachus Street home, and he knew that Mr. York owned a gun. He denied, however, that he and Mr. Dupre were armed the night that Mr. Dupre was killed. Finally, Mr. Sias denied that he knew the amount of cocaine that Mr. Dupre |9was planning to sell to Mr. Newman or the purchase price that Mr. Dupre was to receive, although he believed the amount to be at least two kilograms and the price to be $25,000 per kilogram.
When Detective LeBlanc was recalled to the stand, he also testified that Mr. Sias *876 had told detectives on two occasions that he and Mr. Dupre arrived at the Telemachus Street house approximately an hour and a half before Mr. Newman and Mr. Shelton arrived. Additionally, Detective LeBlanc testified that Mr. Sias had never mentioned to him that there had been a meeting at Mr. Newman’s house earlier in the day or that there had been a second meeting at a daiquiri shop. Finally, Detective LeBlanc testified that Mr. Sias had not previously told him that Mr. Shelton was waiting outside in his vehicle when Mr. Newman first entered the Telemachus Street house. In fact, Mr. Sias had told Detective LeBlanc that everyone had been inside the house conducting a business transaction prior to the shooting.
ERRORS PATENT
The trial court judge sentenced Mr. Newman by stating that “it’s going to be the sentence of this Court that Mr. Newman be turned over to the Department of Corrections for the rest of his natural life.” The sentence was not ordered to be served without benefit of parole, probation, or suspension of sentence as required by La. R.S. 14:30(0 [4].
La. R.S. 15:301.1(A) provides as follows:
When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be | inserved without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.
Although La. R.S. 15:301.1(A) was enacted after Mr. Newman’s crime was committed, that statute has retroactive application under State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790. In Williams the Louisiana Supreme Court stated:
In instances where these restrictions are not recited at sentencing, La.Rev.Stat. Ann. § 15:301.1 (A) deems that those required statutory restrictions are contained in the sentence, whether or not imposed by the sentencing court. Additionally, this paragraph self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute.
2000-1725, p. 10, 800 So.2d at 799.
The Louisiana Supreme Court held in Williams that the correction of a sentence as mandated by La. R.S. 15:303.1(A) “self-activates” and eliminates the need for the case to be remanded for correction of the sentence. Therefore, this Court recognizes that under the holding of the Williams case, the defendant’s sentence is at hard labor without benefit of probation, parole, or suspension of sentence.
I, DISCUSSION
Assignment of Error No. 1: The evidence presented at trial was insufficient to support a verdict of guilty.
In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *877 the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const, amend. XIV, § 1, creates the following standard of review for federal courts reviewing a state conviction:
[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.... The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
443 U.S. at 318-19, 99 S.Ct. at 2788-89 (footnote omitted) (citation omitted).
In State v. Mussall, 523 So.2d 1305 (La.1988), the Louisiana Supreme Court stated that “this court ... recognized that ... the Jackson holding also applies to state direct review of criminal convictions ...” Id. at 1309. The Supreme Court in Mus-sall also recognized that the Louisiana Constitution has a due process clause “virtually identical to its Fourteenth Amendment model. La. Const. Art. I, § 2.” Id.
The Supreme Court in Mussall stated that a review of the record in a criminal case does not require the reviewing court to determine whether the reviewing court believes the evidence at the trial established guilt beyond a reasonable doubt. The Supreme Court further stated as follows:
[A] reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorably to the prosecution as any | ^rational fact finder can.... [T]he inquiry requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this manner could have found the essential elements of the crime beyond a reasonable doubt.
523 So.2d at 1309-10 (footnotes omitted). See also State v. Tate, 2001-1658, p. 4 (La.5/20/03), 851 So.2d 921, 928, cert. denied, - U.S. -, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Sellers, 2001-1903, p. 4 (La.App. 4 Cir. 4/10/02), 818 So.2d 231, 234, writ denied, 2002-1322 (La.1/9/04), 862 So.2d 974.
La. R.S. 14:30 defines first degree murder, in relevant part, as follows:
A. First degree murder is the killing of a human being:
[[Image here]]
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
[[Image here]]
(6) When the offender has the specific intent to kill or to inflict great bodily harm while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance....
La. R.S. 14:24 states that “[a]ll persons concerned in the commission of a crime ... whether they directly commit the act constituting the offense ... [or] aid and abet in its commission ... are principals.”
There is no question in this case that Mr. Dupre, a human being, was killed. Also, Mr. Newman does not dispute that he was present at the Telemachus Street residence on the night Mr. Dupre was killed and that he was there to purchase cocaine, a controlled dangerous substance.[5]
*878 Mr. Newman complains that the State’s entire case is based on the testimony of Mr. Sias, uncorroborated by any physical evidence. Mr. Newman further argues that the testimony given by Mr. Sias at the trial conflicted with Mr. Sias’ own |13pretrial statements. Additionally, Mr. Newman argues that, even according to Mr. Sias’ testimony, Mr. Newman was armed with a nine millimeter gun. Because Mr. Dupre was killed by a bullet from a .38 caliber gun, Mr. Newman claims that he could not have killed Mr. Dupre.
Although at trial Mr. Sias’ testimony conflicted with previous statements he had made to Detective LeBlanc, the inconsistencies were related to the drug transaction in which he participated, not to the shootings that occurred. Mr. Sias’ trial testimony regarding the gunshot wound he received did not deviate from any prior statements that he had made. Additionally, Mr. Sias’ testimony that he was shot with a nine millimeter gun was corroborated by the testimony of Officer Leary, a ballistics expert, and the testimony of Dr. Tracy, an expert in forensic pathology. Dr. Tracy testified that Mr. Dupre was shot multiple times with a nine millimeter weapon. Officer Leary’s testimony established that both Mr. Sias and Mr. Dupre had been wounded with the same nine millimeter gun that was found near the scene of the crime.
Mr. Newman argues that specific intent to kill or inflict great bodily harm, an element of first degree murder, was not established by the State. In State v. Tate, 2001-1658, p. 7 (La.5/20/03), 851 So.2d 921, 930, cert. denied, - U.S. -, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004), the Louisiana Supreme Court stated that “so long as the State sufficiently proves that the defendant is a principal and that he possessed the requisite specific intent, a conviction for first degree murder will be upheld.” Further, “[sjpeeifie intent is a state of mind that may be inferred from the circumstances of the transaction and the actions of the accused.” 2001-1658, p. 8, 851 So.2d at 930.
|14In this case there were a number of circumstances from which a rational trier of fact could have concluded that Mr. Newman had the specific intent to kill or to inflict great bodily harm upon Mr. Dupre. First, there was evidence that Mr. Newman shot Mr. Sias in the head at very close range and that the same gun that was used to shoot Mr. Sias was used to shoot Mr. Dupre numerous times. Mr. Dupre was shot with this gun in the torso, both from the front and the back, in the head, and in other areas of his body. Clearly, shooting Mr. Dupre in the torso and in the head evidences a specific intent on the part of the shooter at least to commit great bodily harm to Mr. Dupre. Further, Mr. Newman does not deny that he was participating in a drug transaction with Mr. Dupre when Mr. Dupre was shot. Therefore, even if the fatal wound were inflicted by someone other than Mr. Newman, Mr. Newman was a principal to the crime because of his intention to kill or inflict great bodily harm upon Mr. Dupre. Thus, he was as culpable as any other person who may have fired the fatal shot. La. R.S. 14:24.
When we view all of the evidence in this case in the light most favorable to the prosecution, we find that any rational trier of fact could have found that all of the essential elements of the crime of first degree murder were present beyond a reasonable doubt. Therefore, this assignment of error is without merit.
Assignment of Error No. 2: The conviction must be overturned, because Mr. Newman was indicted by a grand jury selected pursuant to an impermissible local law.
In his second assignment of error, Mr. Newman argues that he is entitled to *879 a reversal of his conviction, because the grand jury selection procedure used in Orleans Parish at the time that he was indicted was unconstitutional. In State v. Dilosa, 2002-2222 (La.6/27/03), 848 So.2d 546, the Louisiana Supreme Court declared unconstitutional certain statutes and certain parts of statutes relating to the 11flselection of grand juries in Orleans Parish. They were declared unconstitutional on the ground that they constituted local laws that regulated criminal actions and the activities of Orleans Parish criminal courts in violation of La. Const, art. Ill, § 12(A)(3), which prohibits the legislature from passing local laws that concern “any civil or criminal actions, including changing the venue in civil or criminal cases, or regulating the practice or jurisdiction of any court....”[6]
Prior to the decision in the Dilosa case, the Orleans Parish criminal court judges, on a rotating basis, selected grand jurors from a list of names indiscriminately drawn by lot by the jury commissioner from the general venire. The judges also selected the grand jury forepersons. In all other Louisiana parishes the court selected a grand jury foreperson, and the remaining grand jury members were selected by an indiscriminate drawing of names by lot from the grand jury venire. In those parishes, the drawing was conducted by the sheriff.
Mr. Newman argues that he was indicted by a grand jury that was selected pursuant to the procedures established by the statutes that were declared unconstitutional in Dilosa. Therefore, he contends that his conviction should be reversed and his sentence vacated.
In State v. Williams, 2003-0091 (La.App. 4 Cir. 1/14/04), 866 So.2d 296, this Court considered the effect of an indictment made by an Orleans Parish grand jury impaneled pursuant to the statutes that were declared unconstitutional in Dilosa. In the Williams case this Court cited La.C.Cr.P. art. 921, which states that “[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the 11fiaccused.” This Court in the Williams case determined that “the substantial rights of a criminal defendant are not affected per se solely because he is indicted by a grand jury selected pursuant to local laws passed by the Louisiana State legislature.” 2003-0091, p. 3, 866 So.2d at 298. This Court held that “although the trial court erred in denying defendant’s motion to quash his grand jury indictment based on the unconstitutionality of the local laws at issue, there is no showing that the error affected his substantial rights.” Id. (footnote omitted). Therefore, this Court held that the defendant’s indictment, conviction, and sentence were not required to be reversed.
In State v. Mercadel, 2003-3015 (La.5/25/04), 874 So.2d 829, the Louisiana Supreme Court found that a defendant had no standing to challenge certain criminal statutes on the ground that they were prohibited local or special laws under La. Const. art. Ill, § 12(A), because “he failed to establish that application of the subject criminal code articles and statutes had a serious effect on his rights .... ” 2003-3015, p. 831. The Supreme Court found that the Dilosa decision had not addressed the issue of whether a defendant is entitled to relief in the form of quashing his indictment when he has failed to prove that he has suffered injury resulting from the application of the laws that he is challenging. In Mercadel the Supreme Court found that a person can challenge the constitu *880 tionality of a legal provision only if the provision seriously affects his or her rights.
In the instant case Mr. Newman has not shown that his rights were seriously affected by the application of the statutes declared unconstitutional in Dilosa. Therefore, under the holdings in the Williams and the Mercadel cases, Mr. |17Newman is not entitled to relief on the ground that the grand jury that indicted him was impaneled in accordance with those statutes.
Additionally, we note that even though prior to his trial Mr. Newman filed several motions to quash his indictment, none of those motions were based on allegations that the statutes governing the procedure for impaneling a grand jury in Orleans Parish were unconstitutional local laws. Mr. Newman’s motions to quash were based on the following grounds: (1) the general grounds for quashing an indictment that are enumerated in La. C.Cr.P. art. 533[7], (2) the allegation that there has been intentional and systemic exclusion of young, African American males from the grand and petit juries in Orleans Parish, and (3) other matters unrelated to the selection of the grand jury.
At the hearing on the motions to quash the indictment, the trial court judge specifically asked whether Mr. Newman had any evidence to substantiate his allegations in the motions. Mr. Newman’s trial counsel explained that the motions to quash dealt with “the general process” rather than how Mr. Newman was “impacted in any specific instance.” Mr. Newman never argued that the statutes governing the procedures for grand jury selection in Orleans Parish were unconstitutional local laws, and his written motions to quash never raised this issue. Mr. Newman is not entitled to relief based upon his general allegation that the manner in which the grand jury that indicted him was selected was illegal or unconstitutional. To obtain relief he was required to prove how the grand jury | ^selection process was illegal by presenting evidence to support the facts upon which he based his claims that the process was illegal or unconstitutional.
La.C.Cr.P. art. 841 (A) provides in relevant part as follows:
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence .... It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
(Emphasis added.) In the instant case Mr. Newman failed to make known to the trial court that he objected to his grand jury indictment on the ground that the statutes regarding the procedure for impaneling a grand jury in Orleans Parish were impermissible local laws. Therefore, we find that he is precluded from raising that claim now.
We also note that any error that may result from the selection of a grand jury pursuant to unconstitutional local laws is corrected by the conviction of a defendant by a constitutionally constituted petit jury. None of the defendant’s federal or state constitutional rights as a criminal defendant are affected by a grand jury being selected pursuant to laws that are unconstitutional solely because they are *881 local laws[8]. As stated in the Williams case, the state constitutional prohibition against local laws “simply reflects a policy decision that legislative resources and attention should be concentrated upon matters of general interest and that purely 11fllocal matters should be left to local governing authorities.” State v. Williams, 2003-0091, p. 3 (La.App. 4 Cir. 1/14/04), 866 So.2d 296, 298.
Mr. Newman cannot now complain about the grand jury selection process. This assignment of error is without merit.
Assignment of Error No. 3: Mr. Newman was indicted by a grand jury chosen in a manner susceptible to a discriminatory selection process in violation of the Sixth Amendment fair cross-section requirement and the Fourteenth Amendment guarantees of due process and equal protection.
Mr. Newman contends that the procedure by which Orleans Parish grand juries and grand jury forepersons were selected at the time of his indictment was susceptible to discrimination. In particular, Mr. Newman alleges that there was systemic discrimination against black males in the selection of grand juries such that he was denied his rights under both the state and federal constitutions.
In State v. Fleming, 2002-1700, p. 5-6 (La.App. 4 Cir. 4/16/03), 846 So.2d 114, 120, writ denied, 2003-1391 and 2003-1393 (La.11/26/03, 860 So.2d 1132), this Court discussed the legal framework for analyzing claims of discrimination with respect to grand jury selection as follows:
To demonstrate an equal protection violation based on discrimination in the selection of the grand jury itself or the foreperson, a defendant is required to establish a prima facie case of purposeful discrimination. Under the seminal case, Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), a prima facie showing of purposeful discrimination is established by proving “over a significant period of time” that “substantial under-representation” has occurred of a “recognizable distinct class, singled out for different treatment under the laws.” ... One method of establishing such purposeful discrimination is by satisfying the following three-prong test:
1. Those alleged to be discriminated against belong to an identifiable group in the general population.
2. The selection process is subject to abuse according to subjective criteria.
3. The degree of underrepresentation, as shown by | ¡^comparing the proportion of the group at issue found in the general population to the proportion called to serve.
If we apply the analysis discussed in Fleming to the facts of the instant case, the first two prongs of the test are not at issue. First, it is undisputed that black males constitute an identifiable group capable of being singled out for disparate treatment. Second, it is undisputed that the procedure for selecting both the grand juries and the grand jury forepersons in Orleans Parish at the time of Mr. Newman’s indictment was subject to abuse ac *882 cording to subjective criteria that could include race and sex. The dispute arises in connection with the third prong of the test. Mr. Newman, however, did not present any statistical or other evidence to support his claims of discrimination.
To succeed in claiming discrimination in the grand jury selection process, Mr. Newman was required to present a prima facie case supporting his allegations. Mr. Newman’s trial counsel stated that the motion to quash dealt with “the general process and not any specifics as to how my client is impacted in any specific instance.” Mr. Newman presented no evidence in support of his motion when he had the opportunity to do so. This assignment of error is without merit.
Assignment of Error No. 4: Mr. Newman’s conviction must be overturned, because the record of the trial is incomplete depriving Mr. Newman of his right to full judicial review as guaranteed by the Louisiana Constitution.
In this assignment of error, Mr. Newman contends that the record is incomplete and that he will be denied the protection of La. Const art. I, § 19, which provides that no citizen shall be “subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.” In his brief to this Court Mr. Newman stated that the transcript of the voir dire proceedings did not contain the actual selection of the | ^jurors and the exercise of any challenges that were made. After the brief was filed, this Court directed that the record be supplemented with that portion of the proceedings, and this has been done.
Although in his reply brief Mr. Newman has acknowledged that the record has been supplemented with the missing jury selection proceedings, he now contends that the transcript does not indicate that he was present during these proceedings as he was entitled to be.[9] The transcript of the voir dire, however, shows that the trial court judge introduced Mr. Newman to the prospective jurors and asked him to stand. Clearly, Mr. Newman was, in fact, present during the jury selection process.
Mr. Newman also claims in his reply brief[10] that there is no evidence that he was present during the in camera proceedings during which challenges to prospective jurors were exercised. There is no indication, however, that he was absent. If he were absent, no objection to this was lodged at the trial.
In State v. Kahey, 436 So.2d 475, 483 (La.1983), the Louisiana Supreme Court stated:
Presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. Therefore, the presence of the defendant is only essential at proceedings which have a reasonably substantial relation to the fullness of the opportunity of the defendant to defend against the charge. From this principle has emerged the general rule that no claim of error, or at least no claim of prejudicial error, can be based upon the exclusion or absence of a defendant, pending his trial on | Ma criminal charge, from the courtroom, or *883 from a conference between court and attorneys, during argument on or discussion of a question of law.
(Citations omitted.) We, therefore, find that Mr. Newman’s assignment of error claiming that there was no evidence that he was present during in camera proceedings is without merit.
Assignment of Error No. 5: The order of the trial court granting Mr. Newman’s motion for a new trial was improperly reversed by this Court. The seating of a juror who was a career law enforcement officer and a juror who had an undisclosed relationship with the victim deprived Mr. Newman of his constitutional right to a fair trial.
Mr. Newman contends that this Court should not have reversed the trial court’s decision to grant his motion for a new trial. The State, however, argues that Mr. Newman has not presented any new evidence that would justify overruling this Court’s earlier decision. The State also argues that the earlier decision is the law of the case and should not be now disturbed.
In State v. Gillet, 99-2474 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, this Court discussed the law of the case doctrine as follows.
This Court has stated that “an appellate court will not reverse its pretrial determinations ... unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. While a different decision on appeal is not absolutely precluded, judicial efficiency demands that great deference be accorded to the earlier decision.”
763 So.2d at 728 (citations omitted).
After his conviction Mr. Newman moved for a new trial on the grounds that two jurors failed to disclose pertinent information during voir dire. One juror was alleged to have known Mr. Dupre, but she could not be served, so she could not be | ^questioned regarding whether or not she had known Mr. Dupre.[11] Another juror was alleged to have been employed as a law enforcement officer at the time she served on the jury. This juror testified at the hearing on the motion for a new trial. She said that she had been a probation officer for one year[12] but that at the time of the trial, she was unemployed. She further testified that she did not disclose her prior employment, because she was never asked about it during voir dire, something that she thought was unusual.
The trial court originally granted a new trial based on the fact that this juror had not disclosed during voir dire that she had once worked as a probation officer. This Court, however, reversed the trial court’s decision. Based on a review of her testimony at the motion for a new trial, this Court determined that the juror had fairly and impartially considered the case against Mr. Newman. Additionally, not only had this juror’s background not prejudiced Mr. Newman, it may have also spared Mr. Newman from the death penalty. She stated that “my knowledge of the law is why we did not give him the death penalty.”
*884 Mr. Newman still argues, however, that because one of the jurors allegedly knew Mr. Dupre, he is entitled to a new trial. That juror did not testify at the motion for a new trial, but Mr. Newman’s counsel argued that even without her testimony, it was clear that she knew Mr. Dupre, because there was evidence that they had attended Xavier University at the same time. Because Mr. Dupre was a star player on the university’s basketball team, Mr. Newman’s counsel argued that_[^the juror had to have known Mr. Dupre. This argument presupposes, without any evidence, that the juror was a basketball fan. Further, even if this juror were a basketball fan who knew of Mr. Dupre, this does not mean that they were friends or had any other type of relationship.
Attached to Mr. Newman’s brief to this Court is an affidavit of Rasheed M. Lae-our, in which he declared that he attended Xavier University at the time the juror and Mr. Dupre attended the university, that he knew both of them, and that he saw them together on campus on several occasions. The affidavit is not part of the record in this case, however, and we cannot consider it.
We also note with respect to the allegation that a juror knew Mr. Dupre that the voir dire transcript reflects that an unidentified prospective juror, who was on the same panel as the juror who was alleged to have known Mr. Dupre, asked whether Mr. Dupre was a basketball player at Xavier. When the prosecuting attorney replied affirmatively, he asked the unidentified prospective juror whether she knew Mr. Dupre, and she said that she did. When the prospective juror was asked whether the fact that she knew Mr. Dupre would affect her ability to serve as an impartial juror, she said, “No, I didn’t even know he got killed.” The prospective juror did not know Mr. Dupre well, and she specifically stated that the fact that she had some prior knowledge of him would have no effect on her ability to serve as a fair and impartial juror. In all likelihood this prospective juror was the juror that Mr. Newman now claims knew Mr. Dupre. If so, she clearly did not have a relationship with him.
Based on the voir dire transcript, the transcript of the testimony of the juror who had been employed as a probation officer prior to the trial, and our prior review of the trial court’s decision granting a new trial, we find that there is no | ¡¡^reason to reconsider our earlier decision reversing the trial court’s decision. This assignment of error is without merit.
Assignment of Error No. 6: Mr. Newman was represented at trial by counsel who did not provide him with constitutionally effective assistance in violation of his Sixth and Fourteenth Amendment rights under the United States Constitution and the Constitution of the State of Louisiana.
With regard to raising on appeal a claim of ineffective assistance of counsel, the Louisiana Supreme Court stated in State v. Prudholm, 446 So.2d 729 (La.1984), that a “defendant’s remedy is through post conviction relief in the trial court where the quality of the attorney’s assistance can be fully developed and explored.” Id. at 737. In State v. Ratcliff, 416 So.2d 528 (La.1982), however, the Louisiana Supreme Court determined that “[sjince the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, in the interest of judicial economy we will address the issue now”. Id. at 530. See also State v. Seiss, 428 So.2d 444 (La.1983). In the instant case, this Court finds that an evidentiary hearing at the trial court level is not necessary, because the record before us is sufficient *885 for the determination of counsel’s effectiveness at trial.
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court of the United States articulated the test for determining the effectiveness of a criminal defendant’s counsel as follows:
A convicted defendant’s claim that counsel’s assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as 12fito deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
466 U.S. at 687, 104 S.Ct. 2052.
Louisiana courts have adopted the two-pronged test established in the Strickland case for determining the effectiveness of counsel. See, e.g., State v. Fuller, 454 So.2d 119 (La.1984); State v. Wilson, 2000-1736 (La.App. 4 Cir. 11/14/01), 803 So.2d 102.
In State v. LaCaze, 99-0584 (La.1/25/02), 824 So.2d 1063, the Louisiana Supreme Court discussed the effective assistance of counsel that a criminal defendant is afforded. The Supreme Court stated as follows:
A criminal defendant is guaranteed the effective assistance of counsel. U.S. Sixth Amendment; La. Const, art. I § 13. To prevail on a claim of ineffective assistance, a defendant must demonstrate (1) that his attorney’s performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel’s errors or omissions resulted in prejudice so great as to undermine confidence in the outcome. The Sixth Amendment does not guarantee “errorless counsel [or] counsel judged ineffective by hindsight,” but counsel reasonably likely to render effective assistance. Judicial scrutiny must be “highly deferential” and claims of ineffective assistance are to be assessed on the facts of the particular case as seen from “counsel’s perspective at the time,” hence, courts must indulge “a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance. ”
99-0584, p. 20; 1078-79 (footnotes omitted and emphasis added).
In State v. Brooks, 505 So.2d 714 (La.1987), the Louisiana Supreme Court stated that “hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. at 724. This Court l^has also recognized that if the trial counsel’s actions fall “within the ambit of trial strategy”, they do not “establish ineffective assistance of counsel.” State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986).
In the instant case Mr. Newman claims that he received ineffective assistance from his trial counsel, because his trial counsel failed to conduct an adequate voir dire on the issue of the potential jurors’ prior relationships with Mr. Dupre and on the issue of the potential jurors’ employment in the field of law enforcement. ■ Additionally, Mr. Newman complains that his trial counsel should have produced evidence at the *886 motion for a new trial to show that one of the jurors had a significant relationship with Mr. Dupre.
We find no evidence that the failure of Mr. Newman’s trial counsel to inquire about the ties of any of the potential jurors to law enforcement in any way prejudiced Mr. Newman. At the hearing on the motion for a new trial, the juror who admittedly had prior law enforcement experience testified that her background not only did not affect her ability to serve as a fair and impartial juror, it may have resulted in Mr. Newman receiving a life sentence in lieu of the death penalty. We also note that at the time of the trial the juror was no longer employed as a probation officer and that she had only worked as such for one year. She was clearly not a career law enforcement officer.
In the case of the alleged relationship between one of the jurors and Mr. Dupre, there is nothing in the record to substantiate any such relationship. Further, there is nothing in the record to support a finding that the failure of this juror to testify at the hearing on the motion for a new trial was through any fault on the part of the trial counsel. This juror was unable to be served, a circumstance that was beyond the control of Mr. Newman’s counsel.
li>RWe do not find that Mr. Newman’s trial counsel either prejudiced Mr. Newman’s defense or failed to furnish him with the representation to which he was entitled under the state and federal constitutions. Mr. Newman’s assignment of error is without merit.
Assignment of Error No. 7: Mr. Newman’s sentence of life in prison without the benefit of parole, probation, or suspension of sentence is constitutionally excessive, in violation of his Eighth and Fourteenth Amendment rights.
Mr. Newman complains that his sentence is excessive in this assignment of error. He contends that his constitutional rights have been violated by the imposition of a sentence of life imprisonment.
The Louisiana Constitution expressly provides that “[n]o law shall subject any person to cruel, excessive, or unusual punishment.” La. Const, art. 1, § 20. Although the United States Constitution does not expressly prohibit “excessive punishment”, it does prohibit “cruel and unusual punishment.” U.S. Const, amend. VIII.
In State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, 977, the Louisiana Supreme Court stated that the deliberate inclusion of the prohibition against excessive sentences in the state constitution by its redactors imposed on the court the duty to review the sentencing provisions of criminal statutes. The Supreme Court further stated that the court was permitted to determine both whether the statutory range of sentences and the sentence of a particular offender was excessive, even if that offender’s sentence were within the prescribed statutory range. Id.
In State v. Bonanno, 384 So.2d 355 (La.1980), the Louisiana Supreme Court discussed the criteria for determining whether a sentence is unconstitutionally excessive as follows:
| 2q[T]o determine whether a certain penalty is excessive we must determine whether that penalty is grossly disproportionate to the severity of the crime. To determine whether the penalty is grossly disproportionate to the crime we must consider the punishment and the crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice.
384 So.2d at 358 (citations omitted).
In State v. Soco, 441 So.2d 719 (La.1983), the Supreme Court also stated that *887 “[mjaximum sentences provided by the statutes are reserved for the ‘worst kind of offender’.” Id. at 720, citing State v. Quebedeaux, 424 So.2d 1009, 1014 (La.1982). The Supreme Court further stated:
In order for there to be proper review of the sentence to determine its constitutionality, La. Const, art. 1, § 20, that is, whether the defendant is the worst kind of offender, an adequate record specifying the basis for the sentence must be made. This record is mandated by C.Cr.P. 894.1, which also provides the sentencing judge with guidelines to follow when passing sentence.
Id. The Supreme Court has also stated that “[i]f the judge records the factors affecting his sentencing decision, the sentence should not be set aside as excessive unless it is grossly disproportionate to the offense or represents nothing more than the needless infliction of pain and suffering.” State v. Pike, 426 So.2d 1329, 1335 (La.1983).
In the instant case, Mr. Newman did not receive the maximum penalty for his crime. He was spared the death penalty by the jury. The crime he committed was an extremely grave offense, and the record in this case clearly establishes that his sentence was fully justified. He did not dispute that he was engaging in a drug transaction with Mr. Dupre at the time that Mr. Dupre was murdered. He shot Mr. Sias in his face at close range, which certainly evidenced a specific intent to kill or laninflict serious bodily injury to Mr. Sias. Then he shot Mr. Dupre numerous times, and some of the shots were fired into Mr. Dupre’s back. Mr. Newman’s conduct put at least two lives at risk, caused the death of Mr. Dupre, and manifested deliberate cruelty. Additionally, there was no evidence of any mitigating circumstances. The sentence imposed does not shock our sense of justice. It does not represent the needless infliction of pain and suffering. It was appropriate. This assignment of error is without merit.
Assignment of Error No. 8: The trial court erred in failing to articulate the considerations for the sentence as required by La.C.Cr.P. art. 894.1(C).
Mr. Newman complains that the trial court judge did not state on the record the considerations that were taken into account in imposing, his sentence, as required by La.C.Cr.P. art. 894.1(C). M-though the transcript of Mr. Newman’s sentencing hearing does not indicate that the trial court judge expressly stated the considerations for Mr. Newman’s sentence, this Court in State v. Green, 99-2847, p. 8 (La.App. 4 Cir. 11/29/00), 779 So.2d 835, 840, stated that “[w]hen the statute provides for a mandatory sentence, it is an exercise in futility for the trial court to enumerate its reasons for sentencing.” See also State v. Wallace, 2003-0193, p. 27 (La.App. 4 Cir.11/26/03), 862 So.2d 286, 303, where this Court reiterated that “it is an exercise in futility for the court to enumerate reasons for sentencing” when a mandatory minimum sentence is imposed. This assignment of error is without merit.
CONCLUSION
We find no errors in the conviction and sentencing of Mr. Newman. His conviction and sentence are hereby affirmed.
AFFIRMED.

. At the time of the trial Mr. LeBlanc was no longer employed by the NOPD, but we will still refer to him as Detective LeBlanc.

. At the trial the parties stipulated that testing of the object confirmed that it was cocaine. There was also a stipulation that the object, the firearms, and the ammunition were tested for fingerprints and did not yield any fingerprints that were identifiable.

. Mr. Shelton was killed a few days after he was identified by Mr. Sias but before he could be apprehended by the police. At the trial Detective LeBlanc testified that the police never developed a link between the killing of Mr. Dupre and the killing of Mr. Shelton.

. La. R.S. 14:30(C) provides that first degree murder shall be punishable either by "death or by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence" as determined by the jury.

. This prohibition does not apply where the state constitution provides otherwise.

. Article 533 states that one of the grounds for quashing an indictment is that ''[t]he manner of selection of the general venire, the grand jury venire, or the grand jury was illegal” La. C.C.Pr. art. 533(1).

. We note that the issue raised in this case regarding a grand jury that was selected pursuant to laws that are unconstitutional under the Louisiana constitution solely because they are prohibited local laws is a completely different issue from the federal and state constitutional claims that have been raised in connection with grand juries that are selected by procedures that systematically exclude persons based on prohibited discriminatory criteria. Indictment by those grand juries deprives a defendant of federal and state constitutional guarantees to which all criminal defendants are entitled. See, e.g., Rideau v. Whitley, 237 F.3d 472, 484 (5th Cir.2000).

. La. C.C.Pr. art. 831 provides that a defendant charged with a felony shall be present at certain, specified stages of the proceedings against him, including the impaneling of the jury.

. The attorney who prepared the reply brief was not Mr. Newman's trial counsel and, therefore, cannot personally verify Mr. Newman's presence or absence during the juiy selection proceedings.

. There was evidence that both she and Mr. Dupre had attended Xavier University at the same time, but there was no evidence regarding the relationship, if any, between the juror and Mr. Dupre.

. We note that we do not agree with Mr. Newman's characterization of this juror as a "career law enforcement officer” in light of the fact that she was not employed at the time of the trial and had worked as a probation officer for only one year.