947 So.2d 127 (2006)
STATE of Louisiana
v.
Christopher RIDEAU.
No. 2005-KA-0462.
Court of Appeal of Louisiana, Fourth Circuit.
December 6, 2006.
*129 Eddie J. Jordan, Jr., District Attorney, Meri M. Hartley, Assistant District Attorney, New Orleans, LA, for Appellee, State of Louisiana.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant, Christopher Rideau.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge LEON A. CANNIZZARO, Jr.)
LEON A. CANNIZZARO, Jr., J.
The defendant, Christopher Rideau, was convicted of four counts of aggravated battery, one count of second degree kidnapping, and two counts of aggravated assault upon a peace officer with a firearm. Mr. Rideau is now appealing his convictions and sentences.

STATEMENT OF THE CASE
Mr. Rideau was indicted by a grand jury for ten counts of attempted first degree murder of a peace officer in violation of La. R.S. 14:27(30), four counts of aggravated assault upon a peace officer with a firearm in violation of La. R.S. 14:37.2, and two counts of second degree kidnapping in violation of La. R.S. 14:44.1. He was arraigned and pled not guilty on all charges.
Mr. Rideau chose to be tried by the judge on the assault charges, and he chose to be tried by a jury on the other charges. The jury returned verdicts of guilty of aggravated battery in violation of La. R.S. 14:34 on four of the counts of attempted first degree murder of a peace officer and guilty of second degree kidnapping on one of the kidnapping counts. The jury found Mr. Rideau not guilty of the remainder of the charges that it considered.
The aggravated assault charges were tried by the trial court judge. After the State dismissed one of the four charges, the trial court judge found the defendant guilty of aggravated assault upon a peace officer with a firearm on two charges. A not guilty verdict was entered on the third such charge.
Before sentencing, Mr. Rideau filed oral post-verdict motions (which were eventually supplemented in writing) that were denied. Then, after Mr. Rideau waived all legal delays, the trial court judge sentenced him to ten years at hard labor on each of the seven crimes of which he was convicted. All counts, except for one count of aggravated battery, were ordered to be served concurrently. The sentence for one of the counts of aggravated battery was ordered to be served consecutively. Mr. Rideau objected to this. Mr. Rideau filed a motion to reconsider the sentences for the two convictions of aggravated assault upon a peace officer with a firearm. The *130 motion was denied, but a motion for an appeal was granted.

STATEMENT OF THE FACTS
The police were seeking Mr. Rideau's brother, Joseph Rideau, on an outstanding warrant. New Orleans Police Department ("NOPD") Sergeant Errol Foy saw Mr. Rideau's brother enter a car on Sandra Drive in Algiers. Two other people entered the vehicle with Mr. Rideau's brother, who got in the driver's seat of the car and drove away. A chase ensued, and shots were fired from the rear of the car. During the chase, Officer David Kramer of the Crescent City Connection Police Department joined the pursuit, and shots were fired at him. The police were unable to stop the car.
The search for Mr. Rideau's brother intensified, and that night NOPD Officer Brian Elsensohn and his partner, both of whom were in plain clothes in an unmarked police vehicle, found the car that had been involved in the chase. It was parked in front of the residence at 157 Pinewood Court in Algiers. The officers saw someone exit the residence, get in the car, and drive away. The officers attempted to stop the car, but before they could do so, the car was abandoned a few blocks away. The driver escaped. Believing that the driver might have gone back to the residence, the officers returned and knocked on the door. When they did so, the lights inside were turned off, and they heard furniture being moved. No one answered the door.
NOPD Sergeant Bryan Lampard was in charge of the task force that was seeking Mr. Rideau's brother. The police were also looking for Mr. Rideau and a third person. When Sergeant Lampard and other officers arrived at 157 Pinewood Court, Sergeant Lampard knocked on the door but got no response. He then received word from an NOPD dispatcher that the resident at that address had called 911 and stated that the police were not needed. Shortly thereafter, the police received confirmation from an informant that Mr. Rideau and his brother were inside the residence. A SWAT[1] unit was then called to handle the incident.
NOPD Lieutenant Mike Cahn was assigned to the SWAT unit. When he arrived on the scene, he engaged in a conversation with a woman inside the residence. The woman, who was later identified as Latasha Hall, spoke with the police from an upstairs window of the house. When the police said that they were going to enter the house and execute a warrant, she said that if the police entered, "they're going to kill us."
NOPD Officer Maurice Palmer then began formal negotiations with Mr. Rideau's brother. When the negotiations were unsuccessful, a decision was made to deploy tear gas into the residence. One team of policemen led by Lieutenant Cahn stationed themselves in front of the residence. A second team, which included Sergeant Lampard, went to the rear of the two-story residence.
While some officers provided a shield for the other officers, the shielded officers shot tear gas canisters into the residence. After the canisters were deployed, the officers heard the sound of shots from an AK-47 assault rifle.
All of the officers who testified at the trial indicated that there were probably *131 four shots, which occurred with a slight pause between the first two and the second two. The officers at the rear of the residence stated that they could see flashes from the muzzle of a gun coming from an upstairs window. They could also see the track of the bullets through the smoke caused by the shooting of the tear gas canisters. The officers stationed in front of the house similarly indicated that bullets from an AK-47 assault rifle came close to their positions. However, no officer was struck by any of the bullets.
After the tear gas had been deployed and the shots fired, the officers pulled back into safer positions. Around daybreak, Mr. Rideau and his brother emerged from the residence. According to the police witnesses who testified at the trial, Mr. Rideau was armed with an AK-47 assault rifle with a scope and a .75 caliber drum magazine. The rifle was identified at the trial.
Mr. Rideau and his brother, both of whom were armed, each shielded himself from the police with a female hostage.[2] The brothers came out of the house with their hostages three or four times. They did not always have the same gun or the same hostage. The police witnesses testified that the hostages were screaming and crying and that Mr. Rideau threatened to shoot his hostage.
Several of the police officers testified that when the brothers came outside, Mr. Rideau pointed his weapon at them. When he pointed his gun at the officers, he stated that he could see them and was going to kill them. Several of the officers testified that they feared for their lives, in large part because their vests and shields would not protect them from gunfire from an AK-47 assault rifle.
Shortly before the siege ended, Officer Palmer allowed Burley Charles, the father of the Rideau brothers, to talk to his sons. According to the police officers, Mr. Charles appeared to be succeeding in convincing his son Joseph, Mr. Rideau's brother, to surrender. As his brother became emotional and began crying, Mr. Rideau came outside and told his brother that "we're soldiers," that they were going to die, but that they were going to kill some people first. Mr. Rideau's brother then went back inside the house.
When Mr. Rideau's brother came back outside, he was armed with the AK-47 assault rifle with the scope. He was walking with Ms. Hall, who was in front of him and was being used as a human shield. Mr. Rideau and Ms. Smith were in the doorway of the house. Mr. Rideau's brother forced Ms. Hall across the street, causing the police perimeter to be pushed back. At that point, a police sniper was able to aim at Mr. Rideau's brother with a clear shot. Mr. Rideau's brother was killed, and Ms. Hall escaped and ran to the police.
After his brother was shot, Mr. Rideau went back inside the house and forced Ms. Smith to throw the weapons into the grass outside. Mr. Rideau then forced Ms. Smith to exit the residence, he pushed her away, and then he attempted to flee. Mr. Rideau was apprehended with the assistance of a police dog when he tried to run *132 across the yard. Ms. Smith was not harmed.
After Mr. Rideau was taken into custody, NOPD Sergeant Joseph Catalanotto arrived at the scene to lead the follow-up investigation. He testified at the trial that three weapons were seized. One was a nine-millimeter handgun, one was an AK-47 assault rifle with a pistol grip, and one was an AK-47 assault rifle with a scope and a full stock handle. From inside the residence four spent AK-47 cartridges were seized. Two were found on the stairs to the second floor, and two were found in the hallway on the second floor.
At the trial Sergeant Catalanotto identified a variety of crime scene photographs, including photographs that depicted four bullet holes in the residence, two of which were downstairs near the front door and two of which were embedded in the sheetrock in a rear upstairs bedroom. Also, the sergeant identified AK-47 rounds, which were removed from Mr. Rideau's pockets after his arrest, and magazines, which were found in the pockets of Mr. Rideau's brother.
Sergeant Catalanotto also testified that he obtained an informal statement from Mr. Rideau after Mr. Rideau had been advised of his constitutional rights. According to Sergeant Catalanotto, Mr. Rideau stated that he and his brother had spent the days preceding the incident together. They went to the residence on Pinewood Court, because they knew the women who lived there. When one of the women saw the police outside, both Mr. Rideau and his brother retrieved the weapons that were in the house. Mr. Rideau denied firing any weapons, however. He said that he was asleep when the gunshots were fired. Sergeant Catalanotto further testified that Mr. Rideau's statement was not recorded or transcribed and that Mr. Rideau did not execute a waiver of rights form, because Mr. Rideau was unwilling to give a "formal" statement.
NOPD Officer Kenneth Leary, an expert in the examination and identification of firearms, also testified. He said that the four spent cartridges found in the residence were all fired from the AK-47 assault rifle that had been introduced into evidence.
The first defense witness to testify at the jury trial was Toren Washington, who was the fiancé of Mr. Rideau's aunt, Kimberly Rideau. Mr. Washington testified that he was engaged to marry Mr. Rideau's aunt and that both of the Rideau brothers had lived with him and their aunt for approximately ten months. He had been at the scene of the incident but admitted that he could not see what occurred from his vantage point. He said that he could hear what occurred, however.
Ms. Rideau then testified that she arrived at the scene at around daybreak the morning after her nephews had fled to the house on Pinewood Court. She testified that she, too, could hear what transpired. Ms. Rideau denied that Mr. Rideau told his brother not to surrender to the police. She also denied that Mr. Rideau threatened any of the police officers at the scene. Instead, she insisted that it was Mr. Rideau's brother who persuaded Mr. Rideau not to surrender.
Both Mr. Washington and Ms. Rideau testified that Officer Palmer, the negotiator, was verbally abusive to Ms. Rideau's nephews. Ms. Rideau did admit, however, that each of her nephews was holding a woman around the neck. She also admitted that she saw Mr. Rideau point a gun at the police.
Shanika Rideau, the Rideau brothers' sister, testified that she arrived at the scene close to midnight the night of the incident. She said that she heard the police yelling at Ms. Hall to come out of the *133 house within five minutes. They threatened to enter the house, if Ms. Hall did not come outside. She also saw her brothers exit the house, and Mr. Rideau exited after his brother. Additionally, she testified that it was Mr. Rideau's brother who made the statement that he and Mr. Rideau were going to "go out like soldiers" and that only Mr. Rideau spoke to his father.
Mr. Rideau's sister concluded her testimony by recounting the attempts that she had made to locate Ms. Smith so that she could be served with a subpoena to appear at Mr. Rideau's trial. Mr. Rideau's sister stated that she assisted her cousin, who had been appointed as a special process server, in locating Ms. Smith. Mr. Rideau's sister further testified that her cousin had served Ms. Smith with a subpoena.
Mr. Charles, the father of the Rideau brothers, testified that although he arrived at the scene the night the incident began, he was not allowed to talk to his sons until the next morning. Mr. Charles also stated that it was Mr. Rideau who wanted to surrender, not his other son. Finally, Mr. Charles testified that the two women with his sons did not appear to be frightened.
The final defense witness at the jury trial was Ms. Hall. She testified that she had previously dated Mr. Rideau and that on the night of the incident they had made plans to spend the evening together. Mr. Rideau arrived at the residence alone that evening. Ms. Hall said that she and Mr. Rideau were upstairs in the house on Pinewood Court for about an hour when Mr. Rideau's brother arrived at the house and entered uninvited.
According to Ms. Hall's testimony, as soon as Mr. Rideau's brother entered the house, he locked the door and went to an upstairs window. He was armed with a long gun, which had a round magazine. Ms. Hall and the others in the house realized that the police were outside. Mr. Rideau's brother instructed Ms. Hall to call 911 and tell the police that there were two women and a baby in the house, and she did as she was instructed. (No child was present, however.) Later, with Mr. Rideau's brother telling Ms. Hall what to say, she talked with the police from the upstairs window. She told the police negotiator not to let the police break into the house or Mr. Rideau's brother would kill her and Ms. Smith.
When the police shot the tear gun canisters into the house, Ms. Hall ran into a bedroom where she saw Mr. Rideau's brother shooting from the window. She said that it was Mr. Rideau who tried to help her and Ms. Smith when the tear gas was used. He gave them towels to cover their faces. At daybreak, everyone in the house went downstairs. Until that time, according to Ms. Hall's testimony, Mr. Rideau was not armed. Only when everyone went downstairs after the tear gas was used was Mr. Rideau armed. Then the only reason that Mr. Rideau armed himself was that his brother had told him to get a weapon.
Ms. Hall testified that she and Ms. Smith devised a plan to escape their situation by offering themselves as human shields so that Mr. Rideau's brother would not be shot by the police when he left the house. She said that they believed that this was the best plan, because, if the police entered the house, they would be killed in a gun battle. Ms. Hall denied that she or Ms. Smith were forcibly seized by Mr. Rideau and his brother and taken outside the house, although she admitted that she was crying, because she was afraid of Mr. Rideau's brother. Ms. Hall insisted that Mr. Rideau repeatedly tried to get his brother to surrender and that it was Mr. Rideau's brother who had referred to the brothers as "soldiers."
Ms. Hall further testified that, after his brother was killed and Mr. Rideau was *134 taken into custody, she and Ms. Smith were handcuffed by the police and made to sit on the curb outside the house. She said that she and Ms. Smith thought that they were going to be arrested, so they decided to tell the police that they did not know either of the Rideau brothers. When Ms. Hall was presented with a statement that she had given to Sergeant Catalanotto, she admitted that she had told him things that were not true, because she was afraid that she would be sent to jail.
Because Mr. Rideau was tried by the judge on the four counts of aggravated assault upon a peace officer with a firearm at the same time that the jury trial was held, the trial court heard testimony on the aggravated assault charges outside of the presence of the jury. One of the witnesses who testified outside of the jury's presence was NOPD Sergeant Michael Sposito. He testified that he was stationed in the front of the residence when Mr. Rideau emerged from the house. Sergeant Sposito was standing near NOPD Officer Scott Seymour and NOPD Officer Robert Wanfluh. According to Sergeant Sposito's testimony, Mr. Rideau pointed his weapon directly at Officers Seymour and Wanfluh and said to each of them that "I'mma [sic] gonna [sic] get you, I'm gonna [sic] kill you."
Officer Seymour also testified outside the presence of the jury. Officer Seymour testified that Mr. Rideau pointed his weapon directly at him, stating, "I got you, you white mother fucker." Officer Seymour also said that he and Officer Wanfluh were standing in close proximity in front of the residence when the tear gas was deployed.
The judge did not render a verdict at the conclusion of the portion of the trial that was tried before the jury. Instead, the trial by the judge was continued. When the bench trial resumed, the trial court adopted the testimony given at the earlier proceedings before the jury. The judge then heard the testimony of Officer Palmer, who testified that Mr. Rideau pointed a weapon at him. When asked whether he was near Officer Wanfluh at the time, Officer Palmer stated that he could not recall where Officer Wanfluh was. Officer Wanfluh did not testify.
The defense called additional witnesses at the continuation of the bench trial. One of the defense witnesses was Mr. Rideau's mother, who was not present at the siege. The second was Mr. Rideau, who testified that he arrived at the residence in the early evening and that his brother arrived later. Mr. Rideau denied bringing any weapons to the residence and said that the weapons belonged to his brother. Mr. Rideau did admit, however, that he pointed a weapon at the police officers. He explained that he did so solely because the police had their gun sights on him, and he was afraid that he would be shot. He insisted that he was a victim during the incident and that his participation was motivated solely by his fear that, if the police stormed the residence, he would be caught in the crossfire between his brother and the police.
ERRORS PATENT
The only potential errors patent in this case relate to the verdicts rendered by the trial court and the sentences that were imposed on the counts that were tried by the trial judge. Both potential errors patent were raised by Mr. Rideau in his assignments of error. Therefore, the possible errors patent will be discussed in connection with the relevant assignments of error.

DISCUSSION
Assignment of Error Number 1: Mr. Rideau was denied due process when he was tried and sentenced upon an invalid bill of indictment or information.
In his first assignment of error, Mr. Rideau contends that he was denied due *135 process, because the indictment was quashed prior to his trial. Thus, he claims that there was no valid bill of information or indictment upon which his convictions could be based.
A written motion to quash was filed by Mr. Rideau on the ground that the grand jury that returned the indictment against him was impaneled pursuant to an unconstitutional local law. In support of his claim, Mr. Rideau cited State v. Dilosa, 02-2222 (La.6/27/03), 848 So.2d 546. In Dilosa, the Louisiana Supreme Court invalidated portions of certain statutes pertaining to grand jury selection in Orleans Parish, because those portions of the statutes were unconstitutional local laws. 848 So.2d at 551. The statutes that were declared unconstitutional in part in Dilosa were amended in 2001. Thus, any indictment returned by a grand jury impaneled after the amended statutes became effective was not affected by the ruling in the Dilosa case.
To protect a claim pertaining to an indictment alleged to be defective because of discriminatory grand jury selection, a defendant must file a pretrial motion to quash the indictment. State v. Washington, 05-0035 (La.App. 4 Cir. 4/6/05), 900 So.2d 1072, 1076, citing State v. Bradford, 02-1452 (La.App. 4 Cir. 4/23/03), 846 So.2d 880, 887. The failure to do so will bar relief. Id. Additionally, La.C.Cr.P. art. 921 provides that "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."
In State v. Newman, 03-1721 (La. App. 4 Cir. 7/7/04), 879 So.2d 870, this Court stated that "the substantial rights of a criminal defendant are not affected per se solely because he is indicted by a grand jury selected pursuant to local laws passed by the Louisiana State Legislature." 879 So.2d at 879, quoting State v. Williams, 03-0091 (La.App. 4 Cir. 1/14/04), 866 So.2d 296, 298. Thus, as this Court noted in the Newman case, a defendant can challenge "the constitutionality of a legal provision only if the provision seriously affects his or her rights." 879 So.2d at 879-80, citing State v. Mercadel, 03-3015 (La.5/25/04), 874 So.2d 829.
The motion to quash that Mr. Rideau filed contained an order that was, in fact, signed by the trial judge and dated July 9, 2003. The order stated that the motion to quash the indictment was granted. Although the order was dated July 9, 2003, the minute entry for that date stated that Mr. Rideau filed a motion to quash the grand jury indictment and that the motion was set for a hearing on July 16, 2003. The minute entry did not state that the motion to quash was granted. The minute entry for July 16, 2003, however, failed to reflect that any action on the motion to quash had been taken. The minute entry simply indicated that the trial was set for October 7, 2003.
After Mr. Rideau's brief was filed, this Court ordered that the record be supplemented with the transcript of the July 16, 2003 proceedings so that this Court could determine whether the trial court, in fact, ruled on the motion to quash. The transcript, which was filed in this Court as ordered, reflected that the July 16, 2003 proceedings began with Mr. Rideau's attorney noting that there was a pending motion to quash. Mr. Rideau's attorney offered to withdraw Mr. Rideau's motion to quash if the State agreed to a trial date in September or October. The trial court judge set the trial for October 7, 2003. The trial court judge also said that the charges against Mr. Rideau were not required *136 to be instituted by an indictment.[3]
Based on the transcript of the July 16, 2003 proceedings and the rest of the record, we find that Mr. Rideau's counsel withdrew the motion to quash that had been filed. Additionally, based on the record, it is reasonable to assume that the trial court judge inadvertently signed the order granting the motion to quash in error. There was nothing in the July 16, 2003 transcript or in any of the minute entries to indicate that the trial court judge knowingly ruled on the motion to quash. Also, the July 16, 2003 transcript reflects that Mr. Rideau's counsel withdrew the motion to quash in exchange for an October trial date. Therefore we find that this assignment of error lacks merit.
Assignment of Error Number 2: Mr. Rideau was denied due process, because the evidence used to convict him of four counts of aggravated battery, one count of aggravated assault, and one count of second degree kidnapping was insufficient to establish the respective elements of the crimes.[4]
In his second assignment of error Mr. Rideau argues that there was insufficient evidence to support his four convictions for aggravated battery, one of his convictions for aggravated assault upon a peace officer with a firearm, and his conviction for second degree kidnapping. The argument as to the aggravated battery convictions pertains to the lack of any evidence that there was physical contact with the victims and to the objection that Mr. Rideau's attorney raised regarding the inclusion of aggravated battery as a responsive verdict to the attempted first degree murder of a peace officer charge. With respect to the aggravated assault upon a peace officer with a firearm conviction relating to Officer Wanfluh and the second degree kidnapping conviction relating to Ms. Smith, Mr. Rideau argues that because these victims failed to testify at the trial, there was insufficient evidence to convict him of the alleged crimes against them.
Standard of Review for Determining the Sufficiency of the Evidence
The Louisiana Supreme Court, in considering the issue of the sufficiency of evidence necessary to support a criminal conviction, has held that appellate courts in Louisiana are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See, e.g., State v. Brown, 03-0897 (La.4/12/05), 907 So.2d 1, 18; State v. Mussall, 523 So.2d 1305, 1309 (La.1988).
In the Jackson case, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1, creates the following standard of review for federal courts reviewing a state conviction:
[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact *137 could have found the essential elements of the crime beyond a reasonable doubt.
443 U.S. at 318-19, 99 S.Ct. 2781 at 2788-89 (footnote omitted) (citation omitted) (emphasis in original).
In the Mussall case, the Louisiana Supreme Court stated that "this court . . . recognized that . . . the Jackson holding also applies to state direct review of criminal convictions. . . ." 523 So.2d at 1309. The Supreme Court also recognized that the Louisiana Constitution has a due process clause "virtually identical to its Fourteenth Amendment model. La. Const., Art. I, § 2." Id.
The Supreme Court in Mussall held that a review of the record in a criminal case does not require the reviewing court to determine whether the reviewing court believes the evidence at the trial established guilt beyond a reasonable doubt. The Supreme Court said:
[A] reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorably to the prosecution as any rational fact finder can.
. . . [T]he inquiry requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this manner could have found the essential elements of the crime beyond a reasonable doubt.
523 So.2d at 1309-10 (footnotes omitted).
In State v. Williams, 05-0459 (La.App. 4 Cir. 1/18/06), 925 So.2d 567, this Court articulated the standard of review that is applicable to a claim that the evidence produced at a criminal trial was constitutionally insufficient to support a conviction. This Court stated:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt."
925 So.2d at 575, quoting State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657.

Aggravated Battery Convictions
On the ten counts of attempted first degree murder of a peace officer with which Mr. Rideau was charged, the jury found him guilty of aggravated battery with respect to four victims, Sergeant Lampard, NOPD Sergeant Mark Muller,[5] Sergeant Cahn, and Sergeant Sposito. The jury found Mr. Rideau not guilty with respect to the other counts of attempted first degree murder of a peace officer.
Sergeant Cahn and Sergeant Sposito testified that they were assigned to cover the front of the residence when tear gas was deployed into the house. Sergeant Lampard and Sergeant Muller testified they were operating in the rear of the residence when the tear gas was deployed. All of the victims testified that shots were fired in their direction immediately after the tear gas canisters were deployed. None of them, however, testified that he was struck by any bullets or other objects. Instead of returning verdicts of guilty of attempted first degree murder of a peace *138 officer, the jury found Mr. Rideau guilty of four counts of aggravated battery, which is a legislatively responsive verdict to attempted first degree murder under La. C.Cr.P. art. 814 A(2).
Battery is defined in relevant part as "the intentional use of force or violence upon the person of another. . . ." La. R.S. 14:33. Aggravated battery is "a battery committed with a dangerous weapon." La. R.S. 14:34. Mr. Rideau argues that there was insufficient evidence to convict him of aggravated battery, because there was no use of force or violence upon the persons of the four police officers, who were the victims. Furthermore, Mr. Rideau argues that his attorney at the trial objected more than once to the inclusion of aggravated battery as a responsive verdict to the charges of attempted first degree murder of a peace officer. Additionally, the issue was raised by Mr. Rideau's counsel in a motion for a post-verdict judgment of acquittal.
Although the State asserts that the objections at the trial were not timely, because they were raised after the jury was charged, we do not find this argument to be persuasive. The objections were made prior to the start of the jury's deliberations. Thus, the trial court judge could have removed aggravated battery from the list of responsive verdicts to be considered by the jury.
The State concedes that, even though aggravated battery is listed in La.C.Cr.P. art. 814(A)(2) as a responsive verdict to attempted first degree murder, a responsive verdict can properly be removed from a jury's consideration when the elements of the responsive verdict are missing in a particular case. The standard for removing a responsive verdict is set forth in La.C.Cr.P. art. 814(C).
Article 814(C) provides:
Upon motion of the state or the defendant, or on its own motion, the court shall exclude a responsive verdict listed in Paragraph A if, after all the evidence has been submitted, the evidence, viewed in a light most favorable to the state, is not sufficient reasonably to permit a finding of guilty of the responsive offense.
In State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), the Louisiana Supreme Court specifically discussed the issues relating to aggravated battery as a responsive verdict to attempted murder. The Supreme Court noted that the evidence might be insufficient to establish an essential element of a lesser crime if the greater crime does not include that element. The Supreme Court explained that, for example, "aggravated battery is listed in Article 814, subd. A(4) as a responsive verdict to the offense of attempted first . . . degree murder." 424 So.2d at 249, n. 5. Yet, "attempted murder does not include an essential element of aggravated battery, namely the use of force or violence upon the person of the victim. . . ." Id. The Supreme Court further explained that "[n]either does an attempted murder require that use of a dangerous weapon." Id.
In State v. Roberts, 213 La. 559, 35 So.2d 216 (1948), the Louisiana Supreme Court stated:
Thus, it is plain from the definitions of attempted murder and aggravated battery that the elements of the lesser offense are not necessarily included in the greater offense. Two simple illustrations suffice to demonstrate: (1) In attempted murder, use of a dangerous weapon is not essential, whereas, use of such a weapon is a necessary ingredient of aggravated battery and (2) if A intentionally shoots at B missing him, he is amenable to a charge of attempted murder *139 but not aggravated battery as he has not applied force or violence upon B's person with a dangerous weapon.
213 La. at 563-64, 35 So.2d at 217. In the Roberts case, the Supreme Court held that a conviction for aggravated battery was not responsive to a charge of attempted murder, because not all of the essential elements of the crime of aggravated battery were present in that case. Thus, the defendant's conviction and sentence were reversed, and the proceedings against him with respect to the attempted murder charge were dismissed.
Mr. Rideau's argument that the evidence was insufficient to convict him of aggravated battery has merit. The trial court should not have included aggravated battery as a responsive verdict to the charge of attempted first degree murder of a peace officer, because an essential element of the responsive verdict, physical contact with the victim, was missing. Further, Mr. Rideau's attorney specifically objected to instructing the jury that aggravated battery was a responsive verdict to the charge of attempted first degree murder of a peace officer. Additionally, Mr. Rideau's attorney requested the removal of aggravated battery from the list of possible verdicts, and he asked the court to instruct the jury not to consider aggravated battery as a responsive verdict.
Effect of Improperly Including Aggravated Battery as a Responsive Verdict
We have determined that the evidence used to convict Mr. Rideau of aggravated battery was clearly insufficient. Therefore, we must now determine (1) whether Mr. Rideau's convictions for aggravated battery should be reversed and remanded for a new trial, or (2) whether the convictions should be reversed and the charges against him dismissed.
The United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Louisiana Constitution provides that "[n]o person shall be twice placed in jeopardy for the same offense, except on his application for a new trial, when a mistrial is declared, or when a motion in arrest of judgment is sustained." La. Const. art. 1, § 15.
Article 591 of the Louisiana Code of Criminal Procedure also provides that "[no] person shall be twice put in jeopardy of life or liberty for the same offense" except in the case of a defendant's motion for a new trial, an arrest of judgment, or a mistrial. La.C.Cr.P. art. 596 establishes the requirements for double jeopardy as follows:
Double jeopardy exists in a second trial only when the charge in that trial is:
(1) Identical with or a different grade of the same offense for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or
(2) Based on a part of a continuous offense for which offense the defendant was in jeopardy in the first trial.
In Burks v. United States, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150-51, 57 L.Ed.2d 1 (1978), the United States Supreme Court held that the double jeopardy clause of the United States Constitution, U.S. Const. amend. V, precludes a second trial where a conviction is reversed by an appellate court on the grounds that the evidence introduced at trial was insufficient to sustain the verdict. Retrying a defendant is not precluded, however, when a conviction is set aside because of an error in the trial proceedings. 437 U.S. at 15, 98 S.Ct. at 2149.
*140 In State v. Simmons, 01-0293 (La.5/14/02), 817 So.2d 16, the Louisiana Supreme Court noted that under La. C.Cr.P. art. 598,[6] a conviction of a lesser offense is an acquittal of the charged offense. Therefore, the defendant in that case could not be retried on a charge of unauthorized entry of an inhabited dwelling when the jury returned a responsive verdict of the lesser crime of attempted unauthorized entry of an inhabited dwelling. The defendant had requested the trial court to instruct the jury that the offense of criminal trespass, a misdemeanor offense, would be a responsive verdict to the charge of unauthorized entry of an inhabited dwelling.
The Supreme Court in Simmons reasoned that the defendant could not be retried for the greater offense with which he was originally charged, because under La.C.Cr.P. art. 598, he was acquitted of that charge when the jury returned a responsive verdict of a lesser charge. Therefore, the conviction of the attempt crime was reversed and the matter was remanded for a new trial on the lesser attempt charge, with criminal trespass being a responsive verdict to the charge of the attempted offense.
In the instant case the jury returned a verdict for an offense that is statutorily designated as a crime in Louisiana. Further, the jury had the opportunity to return a verdict of guilty as charged or a verdict of guilty of a legislatively mandated responsive verdict. In finding Mr. Rideau guilty of a lesser offense of aggravated battery, the jury acquitted him of all the greater offenses in the indictment, and the State simply failed to prove the essential elements of aggravated battery, the crime of which the Mr. Rideau was convicted. Therefore, retrying him would constitute double jeopardy. Mr. Rideau's convictions for aggravated battery are reversed, and he shall not be retried on the charges relating to the attempted first degree murder of a peace officer.
Aggravated Assault Conviction
Mr. Rideau argues that the evidence was insufficient to convict him of the charge of aggravated assault on Officer Wanfluh.[7] As part of his argument, Mr. Rideau refers to his fourth assignment of error in which he contends that his constitutional right to confront his accuser was denied, because Officer Wanfluh did not testify at the trial. He argues that, because Officer Wanfluh never testified that he was in apprehension of receiving a battery, the State failed to prove an essential element of the offense.
Assault is defined as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."[8] La. R.S. 14:36. One of the prerequisites for proving an assault, as it relates to the second aspect of the definition of "assault," with respect to Officer Wanfluh was proving his reasonable *141 apprehension of receiving a battery. Aggravated assault is defined as "an assault committed with a dangerous weapon." La. R.S. 14:37(A). Aggravated assault upon a peace officer with a firearm is defined as "an assault committed upon a peace officer who is acting in the course and scope of his duties with a firearm." La. R.S. 14:37.2(A).
In the instant case, Mr. Rideau does not contend that the evidence fails to establish the following elements of aggravated assault upon a peace officer with a firearm: (1) that the victim was a peace officer; (2) that the defendant was armed with a firearm; and (3) that the defendant verbally threatened some police officers. Instead, he suggests that the conviction cannot stand, because Officer Wanfluh did not testify at the trial regarding the effect of Mr. Rideau's actions upon him.
We agree. Although other police officers testified that they had a reasonable apprehension of receiving a battery, Officer Wanfluh did not testify. As we will discuss in connection with the second degree kidnapping charge of which Mr. Rideau was convicted, there are certain circumstances under which a victim need not testify for a valid conviction to be obtained. In the case of Officer Wanfluh, however, one of the facts that must be proven to convict Mr. Rideau of aggravated assault with a firearm, i.e., Officer Wanfluh's reasonable apprehension of receiving a battery, is not an objective fact to which another witness can testify and on which that witness can be cross-examined. Officer Wanfluh's state of mind had to be proven, and it was not.
If a conviction could be based on the testimony of others in a case involving a victim's thoughts or state of mind, multiple convictions could be obtained based on the testimony of a single witness who testified that he and all the other people who were with him experienced the same thoughts or state of mind. Thus, if the other people were not required to testify regarding their own thoughts or state of mind, a defendant could be convicted of multiple offenses against multiple accusers, even though the defendant was allowed to confront only one of the alleged victims.
There was no direct evidence presented to show that Officer Wanfluh had "reasonable apprehension" of receiving a battery other than the testimony of other police officers, who testified that they, not anyone else, had "reasonable apprehension" of receiving a battery. Because Officer Wanfluh did not testify, there is no way to know whether Officer Wanfluh also had a "reasonable apprehension" of receiving a battery. The only evidence against Mr. Rideau regarding Officer Wanfluh's state of mind was circumstantial evidence based on the testimony of other police officers.
Circumstantial evidence can be used to convict a person of a crime only when all other reasonable explanations consistent with innocence are negated. La. R.S. 15:438 provides that "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
The police officer who was standing next to Officer Wanfluh testified that Officer Wanfluh was "deploying tear gas" while the testifying officer was "to back him up with my rifle." Therefore, there is no evidence that Officer Wanfluh observed Mr. Rideau pointing a weapon directly at him. Officer Wanfluh had his own vantage point for observing the actions of Mr. Rideau, and although it is reasonable to conclude that Officer Wanfluh was apprehensive in the situation in which he found himself, that is not the only conclusion that can be reached. Thus, the evidence did *142 not show that Mr. Rideau was guilty beyond a reasonable doubt of the crime of aggravated assault with a firearm regarding Officer Wanfluh.
Second Degree Kidnapping Conviction
Mr. Rideau argues that his conviction of the second degree kidnapping of Ms. Smith is based on insufficient evidence, because he contends that Ms. Hall's testimony established that he used Ms. Smith as a shield with Ms. Smith's consent. Additionally, Mr. Rideau claims that his actions were justified. He also asserts that Ms. Smith did not testify at the trial, thus depriving him of his constitutional right to confront his accuser.
La. R.S. 14:44.1 defines the crime of second degree kidnapping in relevant part as follows:
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
. . .
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
In State v. Smith, 00-0523 (La.App. 4 Cir. 12/20/00), 777 So.2d 584, this Court discussed justification as a defense:
The statutory defense of justification is a codification of the legal doctrine of necessity, which generally provides that the existence of extenuating circumstances will defeat criminal culpability. [T]his doctrine has been applied in circumstances other than those enumerated in La. R.S. 14:18, and has been recognized as providing a defense in any case in which it is not expressly prohibited. This is in accord with the language of the first paragraph of La. R.S. 14:18, which specifies that the defense of justification is applicable to any crime, . . . In a non-homicide situation, the defense of justification requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances; and (2) a subjective inquiry into whether the force was apparently necessary.
777 So.2d at 587-88 (citations omitted).
The State did not call either Ms. Hall or Ms. Smith, the two alleged kidnapping victims, as witnesses at the trial. Ms. Hall testified on behalf of the defense, however, and the jury acquitted Mr. Rideau of the kidnapping charges relating to Ms. Hall.
Although the defense subpoenaed Ms. Smith to testify at the trial, she did not appear. Mr. Rideau contends that because Ms. Smith did not testify against him at the trial, he should not have been convicted on the kidnapping charge that involved her. There are, however, circumstances in which a defendant can be convicted of a crime even though the defendant was unable to confront and cross-examine the victim at trial.
In State v. Lee, 01-2082 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, this Court affirmed the conviction of the defendant who was convicted of aggravated battery even *143 though the victim did not testify at the trial. This Court found that the testimony of the investigating officer, photographs of the victim's injuries, and a letter written by the defendant were sufficient to support the defendant's conviction.
This Court stated as follows in the Lee case:
Precedent exists for upholding victim cases where the State does not call the victim to testify. In State v. Preston, 98-0180 (La.App. 4 Cir. 11/10/99), 752 So.2d 211, this Court found sufficient evidence to sustain a conviction for first degree robbery despite the State's failure to call the robbery victim as a witness at trial. The Preston panel cited the defendant's confession to the crime. Id. at 216. See also State v. Guillot, 526 So.2d 352 (La.App. 4 Cir.1988) (upholding a conviction for aggravated battery where the victim failed to testify at trial).
826 So.2d at 624.
It was not disputed at the trial that Mr. Rideau aimed a gun at Ms. Smith while he was using her as a shield to protect himself from the police. There was objective evidence that Mr. Rideau either forced or enticed Ms. Smith to act as a shield when he exited the house. It was also undisputed that he was armed. Although Mr. Rideau contends that Ms. Hall's testimony established that the actions that he took with regard to Ms. Smith were only done under duress as a result of his brother's threats, the police officers testified at the trial that it was Mr. Rideau who urged his brother not to surrender. There was also testimony that Mr. Rideau repeatedly threatened to kill the police officers, conduct which would not have been necessary if Mr. Rideau had merely armed himself at the instructions of his brother. Furthermore, there was testimony that at least once, and possibly twice, Mr. Rideau was behind his brother when they came outside. The inference was clear that, at that point, Mr. Rideau was in a position to surrender or at least to manifest his contention that he was an unwilling participant in the events. Also, even though he was behind his brother, Mr. Rideau still used one of the women as a shield at all times.
While the jury may have concluded that Mr. Rideau did not kidnap Ms. Hall, who was his girlfriend, the jury could still have found the testimony of the police officers credible and concluded that Mr. Rideau willingly forced Ms. Smith outside of the house at gunpoint while using her as a shield to protect himself. The jury could have also found that Mr. Rideau's conduct was not the result of necessity.
Based on the evidence presented at the trial, we have determined that a hypothetical rational trier of fact who interpreted all of the evidence as favorably to the prosecution as a rational fact finder could, would be justified in finding that all of the essential elements of the crime of second degree kidnapping of Ms. Smith were proven beyond a reasonable doubt. See Mussall, 523 So.2d at 1309-10. Therefore, Mr. Rideau's assignment of error regarding the second degree kidnapping is without merit.
Assignment of Error Number 3: Mr. Rideau was deprived of his constitutional right to a jury trial on the four counts of aggravated assault upon a peace officer with a firearm when there was no articulated and knowing waiver of his right to a jury trial.
In this assignment of error, Mr. Rideau argues he was denied his constitutional right to a jury trial as to the four counts of aggravated assault upon a peace officer with a firearm, because the record failed to show a knowing waiver of that right. The pertinent minute entry did not reflect the waiver. After Mr. Rideau filed *144 his brief with this Court, however, this Court obtained a transcript of the colloquy conducted on October 7, 2003, just prior to the selection of the jury. That transcript reflects that Mr. Rideau's attorney moved that Mr. Rideau be allowed to waive the jury on all of the counts of aggravated assault upon a peace officer with a firearm.
Mr. Rideau's attorney argued for a bench trial on the assault charges, because they were triable by a six-person jury, and because the issues to be presented at the trial of those charges were legal in nature. After considering the reasons presented by Mr. Rideau's attorney for waiving the jury trial, the trial court judge called Mr. Rideau to the microphone in the courtroom.
The trial judge asked Mr. Rideau whether he understood that he had "a right to trial by jury as to all 16 counts of this bill of indictment." Mr. Rideau replied that he did. The trial court judge further informed Mr. Rideau that he could waive his right to trial by jury as to the four counts of aggravated assault upon a peace officer with a firearm and select a trial by the court. When asked if he understood that, Mr. Rideau replied, "No, Sir. I don't understand it." The trial court again explained to Mr. Rideau that his attorney was "saying that you wish to waive your right to trial by jury as to these four counts of aggravated assault. And as to those four counts, have a determination of whether you're guilty or not made by me alone. Do you want to do that?"
There was an off-the-record discussion between Mr. Rideau and his attorney, after which Mr. Rideau's attorney informed the court that Mr. Rideau understood what the trial court judge had told him. The judge again asked Mr. Rideau whether he wanted to waive the jury as to the assault charges, and he asked Mr. Rideau whether he understood what was being proposed. Mr. Rideau then confirmed that he did understand. The trial court judge then asked one more time, "And so, Mr. Rideau, it's your desire to waive your right to trial by jury as to those four counts?" Mr. Rideau answered affirmatively, and only then did the trial court judge accept Mr. Rideau's waiver. The trial judge confirmed that the four counts of aggravated assault upon a peace officer with a firearm would be tried by the court and that the "other 12 counts will be tried before a jury."
In State v. Santee, 02-0693 (La.App. 4 Cir. 12/4/02), 834 So.2d 533, 534-535, this Court set forth the test for determining whether a defendant knowingly waived the right to a jury trial:
A defendant may waive his right to a jury trial and elect to be tried by the judge. La.C.Cr.P. art. 780. Generally, the waiver is to be entered at arraignment. However, the trial judge may accept a waiver of a jury trial at any time prior to the commencement of trial. La.C.Cr.P. art. 780(B). A waiver of trial by jury is valid only if the defendant acted voluntarily and knowingly. State v. Kahey, 436 So.2d 475, 486 (La.1983). The waiver must be express and is never presumed. Kahey, 436 So.2d at 486. The record must show a knowing and intelligent waiver. State v. Williams, 99-223 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 606. While it is preferred for the trial judge to advise the defendant personally on the record of his right to a jury trial and have the defendant waive the right personally on the record, the Louisiana Supreme Court has refused to mandate this method as an absolute rule. Kahey, 436 So.2d at 486. While the trial judge must determine if the defendant's jury trial waiver is knowing and intelligent, that determination does not require a Boykin-like colloquy. *145 State v. Frank, 549 So.2d 401 (La.App. 3 Cir.1989).
Based on the colloquy that is part of the record, we find that the trial court adequately advised Mr. Rideau of his right to a jury trial as to all of the charges against him and that he knowingly waived his right to a jury trial as to the four charges of aggravated assault upon a peace officer with a firearm. This assignment of error lacks merit.
Assignment of Error Number 4: Mr. Rideau was denied his constitutional right to confront his accusers when he was convicted of the offense of aggravated assault against Officer Wanfluh and the second degree kidnapping of Ms. Smith when neither Officer Wanfluh nor Ms. Smith appeared to testify against him at the trial.
In this assignment of error, Mr. Rideau argues that he was denied his constitutional right to confront his accusers, because Officer Wanfluh and Ms. Smith did not testify at the trial. The confrontation clause of the Sixth Amendment to the United States Constitution[9] guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is given to defendants in state as well as federal criminal proceedings. The confrontation clause of the Louisiana Constitution[10] specifically guarantees each accused the right to confront and cross-examine the witnesses against him.
In Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), the United States Supreme Court explained that "[c]onfrontation means more than being allowed to confront the witness physically." The Supreme Court cases construing the confrontation clause hold that a primary interest secured by the right to confront one's accusers is the right of cross-examination. Id. Additionally, cross-examination is the principal means for testing the believability and truthfulness of a person's testimony. Id. Cross-examination also permits the cross-examiner to delve into a witness' testimony to test the witness' perceptions and memory and to impeach or discredit the witness. Id. See also State v. Robinson, 01-0273 (La.5/17/02), 817 So.2d 1131, 1135.
Nevertheless, as discussed in connection with the appellant's second assignment of error, the failure of a victim to testify does not necessarily require reversal of a conviction. State v. Lee, 01-2082 (La.App. 4 Cir. 8/21/02), 826 So.2d 616. In Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), the United States Supreme Court confirmed that confrontation clause errors are subject to a harmless error analysis. See also State v. Robinson, 01-0273 (La.5/17/02), 817 So.2d 1131, 1137.
In both the Van Arsdall case and the Robinson case, the United States Supreme Court and the Louisiana Supreme Court have said that the inquiry on appellate review of a confrontation clause error is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." 475 U.S. at 684, 106 S.Ct. at 1438; 817 So.2d at 1137. Additionally, both courts have found that "[w]hether such an error is harmless *146 in a particular case depends upon a host of factors. . . ." Id. The importance of the testimony of the witness in the prosecution's case, whether the testimony of the witness would be cumulative, the presence or absence of testimony that would corroborate or contradict the testimony of the witness on material points, the extent of the cross-examination that was otherwise permitted at the trial, and the overall strength of the prosecution's case are all factors to be considered in determining whether a confrontation clause error is or is not harmless. Id.
We have already determined that Mr. Rideau's conviction of aggravated assault on Officer Wanfluh with a firearm must be reversed based on the reasons given in connection with Mr. Rideau's second assignment of error. Therefore, we will discuss Mr. Rideau's constitutional right to confront his accuser only with respect to the second degree kidnapping of Ms. Smith.
Mr. Rideau's trial attorney filed a motion for a post-verdict judgment of acquittal on the kidnapping charge relating to Ms. Smith, which was based on Ms. Smith's failure to testify at the trial. In the instant case there were witnesses who testified to the facts regarding Ms. Smith's being used as a human shield and as a hostage by Mr. Rideau. The police officers who testified stated that Ms. Smith was used as a human shield by Mr. Rideau when he and Ms. Smith exited the house. The testimony also demonstrated that she was held at gunpoint and that she was screaming and crying.
There was ample objective evidence that was subject to cross-examination from which the jury could have concluded beyond a reasonable doubt that Ms. Smith was held against her will as a hostage and human shield by Mr. Rideau. More than one witness corroborated the factual testimony upon which the kidnapping conviction was based, all the witnesses were subject to cross-examination, and the strength of the case with respect to the kidnapping charge regarding Ms. Smith was very strong. Thus, we find that the failure of Mr. Rideau to confront and cross-examine Ms. Smith at the trial was harmless error. This assignment of error is without merit.
Assignment of Error Number 5: The two ten-year sentences imposed upon Mr. Rideau for his convictions on counts 13[11]and 14 are illegally excessive.
Mr. Rideau argues that the sentences imposed for his convictions for the aggravated assault upon a peace officer with a firearm are illegally excessive, because they exceed the maximum statutory sentence under La. R.S. 14:37.[12] Although Mr. Rideau was charged with violating La. R.S. 14:37.2, which describes the crime of aggravated assault upon a peace office with a firearm, he claims that he was found guilty of the lesser charge of aggravated assault.
Mr. Rideau does note, however, that the minute entry in the record states, "as to count 13, R.S. 14:37.2 aggravated assault w/firearm, the defendant was found guilty by the judge," and that the minute entry reads the same as to count 14. Mr. Rideau suggests that the minute entry itself *147 does not support a finding that he was found guilty as charged because aggravated assault with a firearm is a violation of La. R.S. 14:37.4, which is a different crime from aggravated assault upon a peace officer with a firearm, which is described in La. R.S. 14:37.2. The formal written sentence contained in the record and initialed by the trial judge states that counts 13 and 14 are violations of La. R.S. 14:37.2 "aggravated assault w/firearm."
Mr. Rideau also asserts that the transcript of the rendition of the trial court's verdicts on counts 13 and 14 establishes that he was only convicted of aggravated assault. He relies on the statement by the trial court that "[a]s to counts 11, 13 and 14, this Court is going to find the defendant guilty of aggravated assault." After the minute clerk reminded the trial judge that count 11 had been severed, the trial court judge stated, "As to 13 and 14, this Court is going to find the defendant guilty of aggravated assault." Because the transcript controls in the event of a conflict with a minute entry, see State v. Kirkling, XXXX-XXXX (La.App. 4 Cir. 5/18/05), 904 So.2d 786, writ denied, 05-2045 (La.6/23/06), 930 So.2d 972, Mr. Rideau contends that the statements in the transcript irrefutably establish that he was found guilty only of violating La. R.S. 14:37, which proscribes the misdemeanor offense of aggravated assault. Thus, according to Mr. Rideau, the ten-year sentences imposed on counts 13 and 14 are illegally excessive.
The State in its brief does not dispute that the offense of aggravated assault in violation of La. R.S. 14:37 would be a proper responsive verdict to the charge of aggravated assault upon a peace officer with a firearm. The State argues instead that, when the entire section of the transcript during which the trial court judge rendered his verdict is considered, it is clear that the verdicts on counts 13 and 14 were actually guilty as charged.
The transcript where the trial judge is rendering his verdict reads in relevant part as follows:
Very well. Again, I say the same, Mr. Merritt [defense counsel] and Mr. Rideau: but for the grace of God, that little girl, Miss Smith, is alive. Because  and for that matter, Latasha Hall. The police are good shots. And Joseph Rideau is dead and not Latasha Hall. And they didn't shoot at you. And, therefore, they didn't run the risk of killing the other girl. But with all due respect to you, you put the other girl in that position: where, but for the grace of God, she would be dead today. You came out of that house with a gun. You came out of that house with a gun, and you had that gun in some fashion pointed at the police. That makes you guilty, as far as I am concerned, of aggravated assault. As to counts 11, 13 and 14, this Court is going to find the defendant guilty of aggravated assault.
(Emphasis added.)
When the entire record is reviewed, it is clear that the trial court specifically found that all of the elements of aggravated assault upon a peace officer with a firearm were present in the crime committed by Mr. Rideau. Although it would have been preferable for the court to have stated that Mr. Rideau was found guilty as charged instead of guilty of "aggravated assault," the parties and the trial judge apparently felt that there was no doubt that Mr. Rideau had been found guilty as charged.
The trial court judge also stated that, as to counts 13 and 14, Mr. Rideau was found "guilty," but as to counts "1, 3, 4, 5, he's found guilty; at least guilty of something, not necessarily guilty as charged, but guilty of something in those counts." The court made no such qualification as to *148 counts 13 and 14 nor did Mr. Rideau's trial attorney when he agreed that as to "the aggravated assault, four counts [t]here's one not guilty and two guilty, your record shows. There's still one open remaining."
Notably, when the trial judge sentenced Mr. Rideau on counts 13 and 14 to ten years each, the maximum time of imprisonment under La. R.S. 14:37.2, Mr. Rideau's trial attorney did not object. Instead, the only objection to the sentence was to the trial court's order that the sentence on count 5 run consecutively rather than concurrently with the other sentences. Mr. Rideau's trial attorney later filed a motion to reconsider the sentences specifically on counts 13 and 14, but no mention was made of the argument now raised on appeal that the sentences exceeded the statutory maximum for the crimes for which the defendant was convicted. Instead, Mr. Rideau argued in the motion to reconsider his sentences that the maximum sentence of ten years was excessive on grounds that were completely unrelated to the current argument.
Similarly, when oral argument was heard on the post-verdict and sentencing motions, Mr. Rideau's attorney urged as the sole basis for his motion to reduce the sentences on the convictions on counts 13 and 14 that the convictions fell "in some judicial quarters in this district as a glorified misdemeanor." When the court asked if this argument was as to counts 13 and 14, Mr. Rideau's attorney replied, "Yes, 13 and 14. That's the pointing the gun at the police, for which he received the maximum ten years. . . . But historically, it was a misdemeanor this time three years ago or maybe five."
Considering the transcripts as a whole, we find that throughout the transcript the trial court and Mr. Rideau's trial attorney referred to the verdict of guilty of aggravated assault upon a peace officer with a firearm in violation of La. R.S. 14:37.2 by using the shorthand phrase "aggravated assault" to avoid having to repeat the longer phrase. There was no evidence in the record that there was any confusion on anyone's part that the verdicts on counts 13 and 14 were guilty as charged. There was also no confusion reflected anywhere in the record regarding the legality of the sentences imposed for those convictions. This assignment of error lacks merit.
Assignment of Error Number 6: The consecutive sentence for the aggravated battery of Officer Sposito was not justified by the facts or by the trial court judge's articulated reasons, which took no mitigating circumstances into account. The consecutive sentence doubled Mr. Rideau's sentence, making it unconstitutionally excessive. Mr. Rideau's trial counsel was ineffective in failing to ask for reconsideration of the consecutive sentence after objecting to it.
Because the conviction and the sentence for the charge that was ordered to be served consecutively have been reversed in connection with Mr. Rideau's first assignment of error, we need not address this assignment of error. This assignment of error is moot.

CONCLUSION
Mr. Rideau's convictions and sentences on four counts of aggravated battery are reversed. His conviction and sentence on the count of second degree kidnapping of Ms. Smith are hereby affirmed. His conviction and sentence on the aggravated assault upon a peace officer with a firearm relating to Officer Wanfluh are hereby reversed. His conviction and sentence on the remaining count of aggravated assault upon a peace officer with a firearm are hereby affirmed.
AFFIRMED IN PART AND REVERSED IN PART.
*149 ARMSTRONG, C.J., Concurs in part and dissents in part, with Reasons.
I agree with the majority opinion except the decision to reverse the defendant's conviction of aggravated assault with a firearm on Officer Robert Wanfluh. I would affirm.
The defendant suggests that his conviction cannot stand unless Officer Wanfluh personally testified as to the effect of the defendant's actions upon him.
In State v. Lee, 2001-2082 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, the defendant was convicted of aggravated battery even though the victim did not testify. In discussing the appellant's argument that the testimony of the investigating officer, photographs of the victim's injuries, and a letter written by the defendant were insufficient to support the conviction, this Court stated:
Precedent exists for upholding victim cases where the State does not call the victim to testify. In State v. Preston, 98-0180 (La.App. 4 Cir. 11/10/99), 752 So.2d 211, this Court found sufficient evidence to sustain a conviction for first degree robbery despite the State's failure to call the robbery victim as a witness at trial. The Preston panel cited the defendant's confession to the crime. Id. at 216. See also State v. Guillot, 526 So.2d 352 (La.App. 4 Cir.1988) (upholding a conviction for aggravated battery where the victim failed to testify at trial).
A conviction cannot stand if no rational trier of fact could find the defendant guilty as charged based on the record as a whole. State v. Mussall, 523 So.2d 1305, 1310 (La.1988). The appellate court reviews the record in its entirety because a rational trier of fact would consider all of the evidence presented. The appellate court presumes that the trier of fact acted rationally. Id. Rational credibility calls, rational decisions on the weight of the evidence, and rational inferences drawn from the evidence must stand. Id.

Lee, pp. 8-9, 826 So.2d at 624. See also State v, Taylor, 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589.
Assault is defined as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La. R.S. 14:36. Aggravated assault is defined as "an assault committed with a dangerous weapon." La. R.S. 14:37. An aggravated assault conviction requires proof of only general criminal intent or a showing that the defendant in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from the defendant's act or failure to act. La. R.S. 14:10; State v. Dunn, 30,560 (La.App. 2 Cir. 2/25/98), 709 So.2d 852. One of the prerequisites for proving an assault is an apprehension on the part of the victim. See State ex rel J.M., 1999-136 (La.App. 3 Cir. 6/2/99), 742 So.2d 6, in which the victims testified that they did not believe the juvenile would hurt them or had the capability to carry out his threats. The appellate court concluded that the evidence was insufficient to prove an assault.
In contrast, in the instant case, the police officers who testified were consistent in their testimony that the defendant's actions caused them a real fear of harm. Of particular note is the testimony of Officer Scott Seymour, the victim in count fourteen, who testified outside the presence of the jury that he and other officers "were trying to cover" themselves behind a police vehicle when Joseph came across the street with a rifle and holding one of the hostages. Officer Seymour testified:

*150 And my main objective was Chris, who was positioned at the front doorway. The first thing I noticed was the scope rifle. And I thought to myself; this guy's got a scope rifle. He's got me, you know, in his sights. So he's ready to shoot me. He tells me, he says, yeah; I got you, you white m* * * * * * f* * * * *. You got me; I got you, too. And he-the whole time, he's sittin there pointin'-pointin' the gun at me [sic].....
Officer Seymour also testified that he was standing next to Officer Wanfluh, backing him up, when Officer Wanfluh deployed the tear gas in the front of the residence. Similarly, Officer Michael Sposito testified outside the jury's presence that the defendant exited the residence with the AK-47 with the scope, started looking around, pointed the gun at all of the perimeter positions, saying "I'm gonna get you. I see you. I see you." Officer Sposito further testified that the defendant "started pointing the gun around at every position where we were at." Officer Sposito stated that Officer Seymour was in the same area, in a perimeter position behind a police vehicle, and that the defendant threatened to kill him. When questioned as to the whereabouts of Officer Wanfluh, Officer Sposito testified that "[h]e was at the same position with Officer Seymour." At the continuation of the judge trial, Officer Palmer reiterated his previous testimony that he and the other officers were fearful of the weapon, an AK-47, which the defendant was brandishing because the rounds from such a weapon could penetrate their equipment. In fact, he testified that "a weapon that powerful, the round [that] comes out of it can pierce a vehicle's engine," and thus it did not matter what position the various officers were in, they were all at risk.
Considering this testimony, the circumstantial evidence is sufficient to find that the defendant engaged in conduct with the firearm which placed Officer Wanfluh in reasonable apprehension of receiving a battery.
NOTES
[1] SWAT is an acronym for Special Weapons and Tactics Team. A SWAT unit is used to handle hostage incidents and situations where a person has barricaded himself in a building or other structure. SWAT units have special equipment and training to handle such situations.
[2] One of the female hostages was Latasha Hall, who testified at the trial as a defense witness. The other was Resheka Smith, whose first name is spelled various ways throughout the trial transcript. Ms. Smith did not testify at the trial. Each woman was listed in an indictment as a victim of a second degree kidnapping, because each was used as a human shield and held as a hostage. See La. R.S. 14:44.1. The jury found Mr. Rideau not guilty on the count involving Ms. Hall and guilty as charged on the court involving Ms. Smith.
[3] The charges against Mr. Rideau were not punishable by life imprisonment or death and, therefore, did not have to be instituted by a grand jury indictment. See La.C.Cr.P. art. 382.
[4] Mr. Rideau has also raised pro se an assignment of error asserting that the evidence against him was not sufficient to prove his guilt beyond a reasonable doubt. The discussion of the second assignment of error raised in the brief filed on behalf of Mr. Rideau by his appellate counsel will also address the pro se assignment of error.
[5] The bill of indictment reflects that the officer's last name is Muller. In the transcript it is spelled Mulla
[6] La.C.Cr.P. art. 598(A) states:

When a person is found guilty of a lesser degree of the offense charged, the verdict or judgment of the court is an acquittal of all greater offenses charged in the indictment and the defendant cannot thereafter be tried for those offenses on a new trial.
[7] Mr. Rideau does not contend that the evidence was insufficient to convict him of the charge of aggravated assault upon a peace officer with a firearm on Officer Seymour.
[8] A review of the evidence in the instant case demonstrates that the State did not assert that Mr. Rideau attempted to commit a battery. Instead, the State relied on the alternative definition of "assault", i.e., the intentional placing of another in reasonable apprehension of receiving a battery, in charging him with aggravated assault upon a peace officer with a firearm.
[9] The Sixth Amendment reads in relevant part

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . . U.S. Const. amend. VI.
[10] La. Const. Art. 1, § 16 provides in relevant part that "[a]n accused is entitled to confront and cross-examine the witnesses against him. . . ."
[11] We have already reversed Mr. Rideau's conviction on count 13, the one involving Officer Wanfluh. Thus, the discussion in connection with this assignment of error is only applicable to count 14.
[12] La. R.S. 14:37 provides that aggravated assault is assault committed with a dangerous weapon. The maximum penalty for that crime is a fine not to exceed $1,000.00 or imprisonment for not more than six months or both.