STATE OF LOUISIANA

VERSUS

JUAN C ROMERO

NO. 23-KA-376

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-5153, DIVISION "E"
HONORABLE FRANK A. BRINDISI, JUDGE PRESIDING

February 28, 2024

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Scott U. Schlegel

**<u>AFFIRMED</u>**
   **SMC**
   **FHW**
   **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA

Honorable Paul D. Connick, Jr.

Juliet L. Clark

Thomas J. Butler

COUNSEL FOR DEFENDANT/APPELLANT,
JUAN C. ROMERO

John C. Butler

John D. Perez

**CHEHARDY, C.J.**

Defendant, Juan C. Romero, appeals his convictions of two counts of aggravated assault with a firearm. We affirm.

**PROCEDURAL HISTORY**

Juan Romero was charged by bill of information on October 20, 2022, with two counts of aggravated assault with a firearm in violation of La. R.S. 14:37.4. Specifically, the information alleged is that on or about August 21, 2022, Romero assaulted Adriana Jolla (count one) and Andre Martin (count two) with a handgun. Romero was arraigned on January 5, 2023, and he pled not guilty on both counts. The matter proceeded to trial on May 16, 2023, and a six-person jury unanimously found Romero guilty as charged on both counts. Romero was thereafter sentenced to five years imprisonment at hard labor on each count to be served concurrently, with credit for time served. The district court designated the offenses as crimes of violence.

The instant appeal followed.

**FACTUAL BACKGROUND**

At trial, the State called four witnesses: two officers who responded to the scene, one of the victims, and a handgun expert. The defense called Romero to testify.

***9-1-1 Call***

Prior to calling its first witness, the State entered the 9-1-1 call into evidence and it was played for the jury.[1] In it, the caller identifies herself as "Adriana." She requests that the police be sent to 3528 I-10 Service Road, which is the address for Brothers' Food Market ("Brothers") located in Metairie, Louisiana, because "a man who keeps coming up in the store waiving a gun" claims he is going to kill an

---

[1] The State published a certificate of authenticity of the 9-1-1 audio. Defense counsel did not contemporaneously object to the admission of the audio or to the publication of the 9-1-1 call.

employee. The caller described the man as Spanish looking, wearing a white shirt and black pants, and driving a white car, possibly a Honda. She further advised the dispatcher that the man had just left the store, and that the last time he came into the store, she ran into the back. The caller also stated that the man claimed to have lost his phone several weeks prior, and that he kept coming into the store threatening to kill a worker. She claimed the man threatened two customers with a gun.

***Deputy Ryne Schuler***

Deputy Schuler of the Jefferson Parish Sheriff's Office ("JPSO") testified that on August 21, 2022, while working day watch patrol, he responded to a call for service at Brothers. Deputy Schuler testified that upon his arrival, he met with three Brothers' employees, two females and one male, who claimed that someone (Romero) had entered the store on multiple occasions looking for a female, whom he believed to have taken his phone, and that on the most recent occasion, the man entered the store with a gun.[2] Deputy Schuler stated that the male employee advised him that Romero did not point the firearm at him, rather Romero pointed the firearm in the air, waving it around. Deputy Schuler further testified that the employees provided a verbal description of Romero, and that one of them gave him a photograph of Romero that she had taken with her cell phone. The employees also told Deputy Schuler that Romero had left the scene in a white Honda with an out-of-state license plate.[3]

After meeting with the employees, Deputy Schuler was informed that another officer, Deputy Chad Lachney, had located Romero at 2324 North Hullen Street, only a few blocks away from Brothers. Deputy Schuler explained that he and Deputy Donald Williams responded to that location, where he observed that

---

[2]     Romero was not on the scene when Deputy Schuler arrived at Brothers.

[3]     On cross-examination, Deputy Schuler was questioned about the store's surveillance video of the incident and he testified that it was not available for collection at the time the police report was prepared.

the person being detained (Romero) matched the person depicted in the photograph previously provided by the female employee, Adriana Jolla. Deputy Schuler testified that after Romero admitted to him that he had entered Brothers with a firearm, he was placed under arrest.[4] During the investigation, Deputy Schuler located Romero's handgun, a loaded Taurus semi-automatic 9 mm, in plain sight on the front passenger seat inside Romero's vehicle. Thereafter, Deputy Schuler contacted Crime Scene, which photographed the gun. Deputy Schuler identified photographs introduced into evidence by the State of the gun, magazine, and bullets taken by Crime Scene, which were also introduced into evidence.

Deputy Schuler testified that he was wearing his body-worn camera and that it was activated on the date and time of the incident. A portion of the footage was published and played for the jury. During the playing of the video, Deputy Schuler identified one of the female employees, Jolla, and Deputies Nicholas Songy and Donald Williams in the footage.[5] The footage played for the jury depicts Deputy Schuler arriving at Brothers and deputies speaking with Jolla about the incident, while a second unidentified female is present. A review of additional body-worn camera footage that was also published confirms that Romero was advised of his Miranda rights, and additionally confirms that Romero admitted that he went inside "the building or the business" with a firearm, and stated, "It was my fault …. the heat of the moment … I didn't shoot anybody …" Deputy Schuler testified that he spoke with Romero while Romero was seated in the back seat of his police unit, which contained a camera. The footage from the police unit was also published, wherein Romero confirmed that he went into Brothers with a firearm in his right hand, but denied that he waved the firearm.

---

[4] At trial, Deputy Schuler identified Romero as the individual who was arrested.

[5] The footage from Deputy Williams' body-worn camera was also published.

On cross-examination, when asked whether the male victim indicated that the gun was not pointed at him, Deputy Schuler testified, "Maybe I'd have to see the report, but I know it was communicated the gun was pointed." Deputy Schuler recalled that he was told that the gun was pointed "[i]n the air," and "not down." When asked whether he knew if Romero pointed the gun at any particular person, Deputy Schuler responded that "there were three people inside the store" and that "[w]hen you walk into a place with a gun pointed out, it going to - - and wave it around, it's going to point at everyone I think."

*Adriana Jolla*

The State called Adriana Jolla to testify. Jolla, a former cashier at Brothers, stated that they had a problem with a male customer, later identified as Romero, who had been in the store approximately three times on August 21, 2022, looking for a female employee, who he believed had stolen his cell phone. She claimed that, on the second occasion, Romero threatened to kill the girl when she returned to work. Jolla testified that while Romero was inside the store on the second occasion, she used her cell phone to take a photograph of him to send in a group text to her managers. Thereafter, Romero returned to the store, driving a white Honda, and instead of parking in the parking lot, he parked right in front of the store's door. According to Jolla, after witnessing Romero get out of the vehicle, walk over to the passenger door and open it, retrieve a firearm and then drop it on the ground, Romero opened the door to the store with his left hand and walked inside the store holding a black handgun in his right hand "down like this (indicating)," stating, "I'm telling y'all, she going to lose her life. … she going to lose her life … Somebody going to die behind my phone." Jolla claimed Romero was talking about [an employee] "Erin," and saying that she was going to lose her life.

Jolla testified that Romero walked towards her and another cashier, Andre Martin, while she was at one register and Martin was at the second register. When Jolla told Martin that Romero had a gun, they both ran to the back of the store. According to Jolla, afraid, she went into the bathroom, locked the door, and hid behind a garbage can, because she recalled that Romero had previously come into the store and threatened to kill Martin, stating, "What, you want to die right now?" While she hid in the bathroom, Martin went inside the office in the back of the store. Jolla testified that she did not recall how long Romero remained in the store, but that she and Martin came out of the back when customers came to tell them that Romero had left the premises. When Martin came out of the office, he told her, "I almost lost my life …," and then went home. He later told her that she saved his life. Jolla did not know why Martin did not come to court to testify.

On cross-examination, Jolla testified that she was aware of Romero before August 21, 2022, because he had previously come into the store, claiming to work offshore. Jolla stated that while Romero never threatened her directly, and never pointed the gun in her face, he was "waving it like somebody going to die." Jolla explained that she was afraid because Romero was angry and had come inside the store with a gun and was waving it all around. She stated that after Romero left the premises, she called 9-1-1 because Romero had not only threatened Martin, he also threatened another unknown female that was in line behind Romero. She claimed that Romero told the unknown female, "What, you had something to do with my phone, cause I'll kill you right now?" According to Jolla, Romero followed the female outside to her car, and the female called the police first.

When asked if she knew anything about an incident involving Romero's phone, Jolla testified that she was aware that he had left his phone in the store overnight, and that he claimed that someone had called "his old lady, or wife" from that phone. Jolla stated that she took a photo of Romero's phone and sent it in a

group text, saying that she was leaving the phone "right here." She claimed that she did not know anything more about the incident and did not do anything with the phone.

Jolla identified Romero as the person who came into Brothers with a gun in his right hand on August 21, 2022.

### Sergeant Chad Lachney

Sergeant Lachney, a fifteen-year veteran with the JPSO, currently assigned to its training facility, testified that at the time of the subject incident, he was a deputy in the First District and was an assisting unit to the initial call. He stated that after briefly appearing at the scene of the incident in order to obtain a description of the suspect and the suspect's vehicle, he canvassed the area to look for the suspect, or possible suspect vehicle, which had been described to him as a "light four-door sedan with an out-of-state, possibly North Carolina, license plate." He testified that within five minutes of leaving Brothers, he located the suspect's vehicle backed into a parking space in the parking lot of an apartment complex only a few blocks away, and thereafter, notified the deputy handling the call at the scene. Sergeant Lachney stated that the suspect (Romero) was sitting in the driver's seat of the vehicle. According to Sergeant Lachney, as soon he approached the vehicle, he saw a firearm in plain view on the front passenger's seat, and then asked Romero to step out of the vehicle to get him away from the firearm. Once Romero was out of the vehicle, Sergeant Lachney detained him, patted him down, and Mirandized him.

On cross-examination, Sergeant Lachney testified that he was not involved in interviewing the store employees and had no knowledge of whether Romero waved a gun in anyone's face.

23-KA-376                                6

### Deputy Scott Pellegrino

Deputy Pellegrino, a firearms examiner trainee with the JPSO Crime lab, was accepted as an expert firearms technician on behalf of the State, with no objection by defense counsel. He testified that he prepared the Firearms General Report, which reflected the firearm seized in this case was test-fired and operational.

### Juan Romero

In his own defense, Romero testified that he is a heavy equipment machine operator for Boh Bros. Construction Company, and that he carries a firearm because he had previously been robbed at a job site, which was located across from the housing projects. Romero denied that he had ever met Adriana Jolla, and has never worked offshore as Jolla testified. Romero also denied that he ever spoke with Jolla or that he ever waved a gun in her face. Further, when asked if he threatened customers, Romero responded, "Not at all. I did not. I did not." He recalled that when he went to retrieve his phone, he was told that the location of his phone was unknown. He claimed that the employees started laughing at him and were saying, "Oh, he got it, she got it, he got it, we don't know who got it." Romero testified, "I don't mean … for this to happen, but you know, in the heat of the moment, I was just mad because they were laughing at me." He further stated that the laughing made him angry because he knew "they took my phone." Romero claimed that he had no reason to threaten Jolla and denied that he waved a gun in the air.

On cross-examination, Romero conceded that the firearm was his, the bullets were his, that he brought the gun into Brothers, and that the bullets were in the firearm at that time. Romero further acknowledged that he went into Brothers more than once on that day, claiming, however, that he only went there twice. According to Romero, his phone was stolen *that* day and, at the time, there were

three people in the store, but he does not know which one of them stole it. He stated that "[b]ecause they were laughing" and making fun of him saying, "you got it, no, she got it, no, he got it," he knows that one of them stole it. He claimed that their making fun of him was upsetting and frustrating because they had his phone and he had to go to work that day. Romero testified that the first time he entered the store, he did not have his gun, but when he went there a second time to retrieve his phone, he entered the store with his firearm loaded with six bullets. Romero explained that it was his intention to retrieve his phone, not to hurt anyone. He denied that anyone in the store threatened him or pulled out a firearm on him. Further, Romero testified that of the three employees in the store (two females and a male), one of the clerks did not run to the back of the store when he entered with his gun. He could not recall if Jolla or Martin went to hide in the back of the store.

Romero acknowledged that the police found him only a few blocks away, in the parking lot of an apartment complex, where he claimed to reside. Romero testified that he did not call the police to report his stolen phone because "they took [his] phone," so he no longer had a phone to make that call. Romero stated that he told the police he entered the store with the firearm. When asked about Jolla's testimony that he was going to kill someone, Romero testified that Jolla was lying, and that he never said that. He reiterated that he did not know Jolla, and that Jolla did not know him. He claimed he brought the gun inside with him because the people in the store were making fun of him.

On re-direct, Romero re-emphasized that all three of the employees were laughing at him, and that he "was mad at everybody because they stole [his] phone."

**ASSIGNMENT OF ERROR**

Romero assigns as error that he was denied due process because the evidence was insufficient to uphold his convictions for aggravated assault with a

firearm in violation of La. R.S. 14:37.4. Specifically, Romero argues that the evidence was insufficient as to count one because there was no indication that he threatened Jolla, pointed the firearm at her, or waved the firearm in her face. As to count two, Romero argues the evidence was insufficient because Martin did not appear at trial to testify, and circumstantial evidence as to his state of mind is not sufficient to uphold his conviction.

In response, the State contends Romero's intent to scare both victims and place them in reasonable apprehension of receiving a battery was established beyond a reasonable doubt through the testimony of Jolla and Romero.

**DISCUSSION**

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189.[6] A review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. *State v. Jones*, 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found that the State proved the essential elements of the crime beyond a reasonable doubt. *Id.*; *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1034. The requirement that the evidence be viewed in

---

[6]     The proper procedural vehicle for raising the issue of the sufficiency of the evidence is a motion for post-verdict judgment of acquittal. La. C.Cr.P. art. 821; *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 816, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2. In the instant case, Romero did not file a post-judgment of acquittal. Nevertheless, the failure to file a post-judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. S*tate v. Manuel*, 20-172 (La. App. 5 Cir. 6/2/21), 325 So.3d 513, 538, *writ denied*, 21-926 (La. 10/12/21), 325 So.3d 1071.

the light most favorable to the prosecution requires the reviewing court to defer to "the actual trier of fact's rational credibility calls, evidence weighing and inference drawing." *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297.

Further, a reviewing court commits error by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Miller*, 20-182 (La. App. 5 Cir. 12/23/20), 308 So.3d 1246, 1256, *writ denied*, 21-233 (La. 4/27/21), 314 So.3d 838. "The reviewing court is not permitted to decide whether it believes the witness or whether the conviction is contrary to the weight of the evidence." *Id*. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 382-83, *writ not considered*, 19-1869 (La. 1/28/20), 288 So.3d 123.

Evidence may be either direct of circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *Gatson*, *supra* (citing *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833). When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides, "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738

So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208. This is not a separate test from the *Jackson* standard, but rather, provides a helpful basis for determining the existence of reasonable doubt. *Id.*

In the instant case, Romero was convicted of two counts of aggravated assault with a firearm. Aggravated assault is defined in La. R.S. 14:37.4 as "an assault committed with a firearm." For purposes of the offense, a firearm is defined as "an instrument used in the propulsion of shot, shell, or bullets by the action of gunpowder exploded with it." *See* La. R.S 14:37.4(A) and (B). Assault is "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La. R.S. 14:36. A battery is defined, in pertinent part, in La. R.S. 14:33 as "the intentional use of force or violence upon the person of another." Aggravated assault with a firearm has been described as "[a]n attempt to use force or violence upon the person of another with a firearm, or the intentional placing of another in reasonable apprehension of receiving force or violence with a firearm." *State v. Watson*, 21-725 (La. App. 3 Cir. 4/27/22), 338 So.3d 95, 101.

In *State in Interest of Tatom*, 463 So.2d 35, 37 (La. App. 5 Cir. 1985), the defendant argued the State had failed to prove the victim was "in reasonable apprehension of having a battery committed," and this Court stated,

> The elements of assault are:
>
> > (1) the intent-to-scare mental element (general intent);
> > (2) conduct by the defendant of some sort to arouse a reasonable apprehension of bodily harm; and
> > (3) the resulting apprehension on the part of the victim.

*Id.*; *State v. Blaise*, 504 So.2d 1092, 1094 (La. App. 5 Cir. 1987). This Court has recognized that the definition of assault includes "two theories of culpability: an 'attempt to commit a battery' and the 'intentional placing of another in reasonable

apprehension of receiving a batter.'" *State v. Barnett*, 12-816 (La. App. 5 Cir. 5/16/13), 118 So.3d 1156, 1163.

Aggravated assault requires proof of only general criminal intent or a showing that the defendant, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2); *State v. Brown*, 17-124 (La. App. 4 Cir. 12/12/17), 234 So.3d 978, 982, *writ denied*, 18-10 (La. 6/15/18), 257 So.3d 678.

Here, Romero does not contest that he was in possession of a firearm when he entered Brothers, or that Jolla (count one victim) and Martin (count two victim) were inside Brothers when he did so. To the contrary, Romero argues the State failed to prove the elements of aggravated assault. Specifically, he contends the evidence was insufficient to establish that he acted with the requisite criminal intent or that either Jolla or Martin were placed in a reasonable apprehension of receiving a battery so as to convict him of aggravated assault with a firearm. We disagree.

### *Count One – Adriana Jolla*

Jolla testified that Romero initially entered Brothers, made threats, and followed an unknown female to her vehicle. Jolla expressed enough concern that she used her cell phone to photograph Romero and forward the picture to her manager. Jolla testified that Romero entered a second time, waving a firearm, and making threats while walking directly toward her and Martin, who were behind the counter. She stated that because she was afraid, she ran to the bathroom, locked the door, hid behind the garbage can, and called the police. Romero stated that he entered the store "in the heat of the moment" with a loaded firearm searching for someone who had stolen his phone. Romero testified that Jolla was not truthful in her testimony, and that he never pointed or waved the gun. The discrepancy in

Jolla and Romero's testimony presented a credibility determination for the jury to make, and based on the verdict, it is clear that the jury believed Jolla's version of the events over Romero's. The jury's credibility determination is not to be reweighed on appeal. *Miller*, 308 So.3d at 1256.

Romero further argues that Jolla did not give any testimony that he was waving the gun around. A review of the transcript, however, evidences that Jolla testified that when Romero returned to Brothers, "He was still holding [the gun] in his hand saying somebody going to die. I mean, he was waving a gun. Directly did he hold it on me, no, but he's waving it like somebody going to die." Additionally, in the 9-1-1 audio, Jolla reported that Romero was waving a firearm.

The law does not require that a defendant actually point the firearm directly at a victim in order to place the victim in reasonable apprehension of receiving a battery. *See Blaise*, *supra*. In *Blaise*, the defendant entered a bar, brandishing a gun. Two witnesses testified the defendant was holding a gun, and one witness said the defendant appeared to be looking for someone. The defendant denied this version of the events. This Court held that under the *Jackson* standard of review, the evidence was sufficient to prove the first two elements of the offense—general intent and conduct to arouse a reasonable apprehension of bodily harm—beyond a reasonable doubt as enumerated in *State in Interest of Tatom*, *supra*. The victim testified that she left the scene and contacted the police. This Court found that the victim's testimony regarding her actions was sufficient to prove the third element, the victim's apprehension, even though she did not testify as to whether or not she was apprehensive. *Blaise*, 504 So.2d at 1094.

In accordance with *Blaise*, we find that Romero did not need to point the firearm directly at Jolla in order for her to be in reasonable apprehension of receiving a battery. Jolla's testimony proved she was placed in reasonable apprehension of receiving force or violence with a firearm. She expressed that she

was afraid when Romero entered Brothers waving a firearm, while making threats that someone would die. Additionally, we find that Jolla's actions of running to the bathroom, locking the door, and calling 9-1-1 for assistance is sufficient evidence to establish that she was in reasonable apprehension of receiving force or violence. Thus, under the *Jackson* standard, we find the State presented sufficient evidence to prove that Romero intentionally placed Jolla in reasonable apprehension of receiving force or violence with a firearm. The evidence adduced by the State was sufficient to prove all three elements of assault as outlined in *State in Interest of Tatom*, *supra*.

### Count Two – Andre Martin

Romero argues the evidence presented by the State was insufficient to prove he was guilty beyond a reasonable doubt of the crime of aggravated assault with a firearm as to Martin. In particular, Romero contends the evidence was insufficient to prove Martin was in reasonable apprehension of receiving a battery because Martin did not testify at trial. Relying on *State v. Rideau*, 05-462 (La. App. 4 Cir. 12/6/06), 947 So.2d 127, Romero contends that whether a victim has "a reasonable apprehension of receiving a battery is not an objective fact to which another witness can testify and on which that witness can be cross-examined." *Id*. at 141. According to Romero, no direct evidence of Martin's state of mind was given because he did not testify, and the only evidence presented by the State was circumstantial evidence of Martin's state of mind, in the form of Jolla's testimony.

In response, the State, argues that *Blaise*, *supra*, supports the conclusion that circumstantial evidence can be used to prove the victim's state of mind.

We find Romero's reliance on *Rideau* is misplaced. In *Rideau*, the appellate court determined that there was no direct evidence to show that the victim, a peace officer, had reasonable apprehension of receiving a battery because the officers "testified that they, not anyone else, had 'reasonable apprehension' of receiving a

battery." *Rideau*, 947 So.2d at 141. The appellate court additionally found that there was no evidence that the victim peace officer observed the defendant pointing a weapon directly at him. Based on the evidence presented, the appellate court concluded that "reasonable apprehension of receiving a battery is not an objective fact to which another witness can testify and on which that witness can be cross-examined." *Id.*

In the case *sub judice*, both Jolla and Deputy Schuler testified about what Martin said and about his actions in response to Romero. Jolla testified that Romero initially entered Brothers and threatened to kill Martin when he twice asked Martin, "What you want to die right now?" Jolla further testified that Romero returned to Brothers holding the firearm in his hand, and while waving it, stated, "[S]omebody going to die." Jolla described that after Romero walked inside the store, he walked towards her and Martin, and they ran to the back of the store. While she hid in the bathroom behind a garbage can and locked the door, Martin went inside the office. Jolla testified that after Martin came out of the office, he twice told her, "I almost lost my life[,]" and he went home. She stated that she spoke to Martin after the incident and that he told her, "I didn't even see him coming. Thank you, I could have lost me [sic] life. You really saved my life." Additionally, Deputy Schuler testified that "the male employee" advised him that, while Romero did not point the firearm at him, he pointed the firearm in the air, waving it around.

Considering the testimonies of Jolla and Deputy Schuler, we find the evidence shows that when Martin observed Romero brandishing a firearm, he ran into the back of the store because he was in reasonable apprehension of receiving a battery. Jolla's testimony that, on the day of the incident, after Romero left the store, Martin said, "I almost lost my life[,]" is relevant evidence that proves Martin's existing mental impression. As this Court concluded in *Blaise*, *supra*, we

find that Martin's response in running from Romero after Romero walked in the store with a firearm, and expressing to Jolla that he could have lost his life, is sufficient evidence that Martin was in reasonable apprehension of receiving a battery. Courts have upheld circumstantial evidence to be sufficient to prove the victim's state of mind. *See State v. Boutte*, 10-1257 (La. App. 3 Cir. 5/11/11), 65 So.3d 793; *State v. Preston*, 98-180 (La. App. 4 Cir. 11/10/99), 752 So.2d 211, *writ denied*, 00-966 (La. 3/16/01), 786 So.2d 744, *writ denied sub nom. State ex rel Preston v. State*, 00-1042 (La. 3/16/01), 786 So.2d 745.

Under the *Jackson* standard, we find the State presented sufficient evidence to prove that Romero intentionally placed Martin in reasonable apprehension of receiving force or violence with a firearm. We further find that the evidence presented by the State was sufficient to prove all three of the elements of assault as outlined in the *State in Interest of Tatom*, *supra*.

**ERROR PATENT DISCUSSION**

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). The review reveals no errors patent in this case.

Accordingly, for the foregoing reasons, Romero's convictions are hereby affirmed.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**FEBRUARY 28, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

**23-KA-376**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE FRANK A. BRINDISI (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JOHN D. PEREZ (APPELLANT)

### MAILED
JOHN C. BUTLER (APPELLANT)
ATTORNEY AT LAW
3939 NORTH CAUSEWAY BOULEVARD
SUITE 301
METAIRIE, LA 70002

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053